Bruce Lindroth, Minor, by Alban Lindroth, Father and Next Friend, Appellee, v. Walgreen Company and Knapp-Monarch Company, Appellants.

Gen. No. 44,152.

Opinion filed June 14, 1949. Released for publication September 16, 1949.

Lord, Bissell & Kadyk, of Chicago, for certain appellant; Gordon R. Close and Leonard F. Martin, both of Chicago, of counsel.

Werner W. Schroeder and Querrey & Harrow, all of Chicago, for certain other appellant; Werner W. Schroeder, Corwin D. Querrey, Joseph Harrow, Theodore W. Schroeder, and James E. Hastings, all of Chicago, of counsel.

Joseph D. Ryan and Louis P. Miller, both of Chicago, for appellee.

Mr. Justice Scanlan delivered the opinion of the court.

An action on behalf of Bruce Lindroth, a minor, against Knapp-Monarch Company, the manufacturer, and Walgreen Company, the seller, of a certain vaporizer, for damages for personal injuries to plaintiff as the result of burns received in a fire which plaintiff claims was caused by said vaporizer. In a previous trial, at the close of plaintiff's evidence, a verdict was directed for both defendants and judgment was entered thereon. Plaintiff appealed to this court and we reversed the judgment and remanded the cause for a new trial as to both defendants (see 329 Ill. App. 105). Upon the present trial the jury returned a verdict

against both defendants for $65,000, and judgment was entered thereon. Defendants jointly and severally appeal.

Upon the appeal from the judgment entered in the first trial the sole question before us was, under the facts and circumstances in evidence, Did plaintiff make out a *prima facie* case against defendants? After a review of the facts and circumstances in evidence we held that plaintiff made out a *prima facie* case against both defendants. As the facts proved by plaintiff in the first trial were substantially proved upon the second trial, we quote from our opinion upon the first appeal in order to show the pertinent facts and circumstances in evidence (pp. 107–111):

". . . Bruce Lindroth was injured on May 8, 1940. A vaporizer is a vessel heated by electricity, which is designed to direct medicated vapor in concentrated form toward the patient. The child's mother had previously owned another vaporizer, somewhat smaller than the 'Kwikway' vaporizer [the vaporizer in question] and of a different model, which had a cut-off or safety device which automatically disconnected the current when it became too hot, thus preventing overheating, with its attendant dangers. This vaporizer had been broken and the mother decided to buy another in order to treat the child, who had a cold. She went to her local Walgreen store and asked for a vaporizer, and the clerk showed her one. The vaporizer was in a cardboard box, which the clerk opened. The mother (hereinafter called Mrs. Lindroth) stated that she had never heard of the 'Kwikway' brand and asked the clerk if there was a 'shut-off' on it. The clerk told her that it had no shut-off, but that the vaporizer 'is good for about two hours.' 'It holds enough water, it can't boil down.' Mrs. Lindroth then asked the clerk: ' "Well, are you sure it doesn't have to be watched all the time?" I said, "I have one at home that has an automatic shut-off on it, and I have never had

any trouble with it. Will this be safe to leave?" She said, "Yes, I am sure it is safe for at least two hours." ' Mrs. Lindroth testified that she bought the vaporizer because she relied upon the statements made by the clerk; that after returning home she took Bruce into the bathroom, sponged him off, and rubbed him with camphorated oil; that before doing this she opened the box containing the vaporizer, read the directions, and tested the vaporizer. On the outside of the carton in which the vaporizer was packed appeared the words: 'Quick, safe, no-flame, electrical.' A circular containing directions was packed with the vaporizer and Mrs. Lindroth read it before she used the vaporizer. In the circular appears, *inter alia,* the following: 'No danger from flame.' After bathing Bruce Mrs. Lindroth put him to bed clad in a 'snuggle-bunny,' a garment which fastened around the baby and was made fast to the bed. Mrs. Lindroth set the vaporizer on a stool, or doll's high-chair, which was alongside the bed and about two feet distant from it. She then applied some medicine on the cotton pad in the spout, put the top on the vaporizer, having already filled the vaporizer with warm water up to an inch or an inch and a half from the top, in accordance with the written directions, and then connected the vaporizer with the electric current. She stood there until the vapor was coming out of the spout, saw that it was pointed in the right direction, and then left the room. After performing some household duties downstairs she went upstairs to the room where Bruce was, saw that he had just finished his orange juice and was turning over on his stomach to go to sleep. The vaporizer was then working all right. She then went downstairs and performed some household duties and talked with a Mrs. Kays, a friend. About forty-five minutes after the time that she had looked into the bedroom and saw that everything was all right, a neighbor ran over to the Lindroth home and told her that there was smoke

coming out of the bedroom upstairs. Mrs. Lindroth rushed upstairs, opened the bedroom door, and discovered the bedroom in flames. The stool, or highchair, on which the vaporizer stood was partly burned, the curtains in the room were burning, also the bed clothing, the crib and the 'snuggle-bunny.' Plaintiff's evidence also tended to prove that within the forty-five minutes that elapsed from the time the current was applied until the fire was discovered a considerable part of the vaporizer had burned or melted away. On the bottom of the vaporizer several patent numbers appear: 'Pat. Nos. 1,976,939 2,061,148.' Plaintiff introduced in evidence as an exhibit a certified copy of letters patent issued by the United States Patent Office on November 17, 1936, to Knapp-Monarch Company. The certificate of the Commissioner of Patents certifies: 'This Is To Certify that the annexed is a true copy from the records of this office of the Letters Patent of William H. Fischer, assignor to Knapp-Monarch Company, *Number 2,061,148,* Granted November 17, 1936, for Improvement in Vaporizers.' (Italics ours.) Attached to the certificate is a copy of the application for the proposed improvement to the vaporizer. The certificate shows that this application was filed by 'William H. Fischer, St. Louis, Mo., assignor to Knapp-Monarch Company, St. Louis, Mo., a corporation of Missouri.' Attached to the application is a drawing of the proposed vaporizer and specifications in reference to the same, the drawing showing the proposed cutout. The application contains, *inter alia,* the following:

" 'When the water W in the receptacle 12 has been completely vaporized, there is danger of overheating and damaging the heating element H. I therefore provide a thermal cutout comprising contact springs 66 and 68. These are mounted on and insulated from brackets 70 and 72 respectively which are secured to the bottom plate 20 and project upwardly therefrom. The spring 68 is of bimetal so that upon its being

heated to a predetermined temperature it will warp to the dotted line position in Figure 3, thus releasing the spring 66 and allowing it to assume its dotted position, thus breaking the circuit between the free ends of the springs 66 and 68. The springs, it will be noted by referring to Figure 6, are included in series circuit with the heating element H whereby energization thereof is discontinued when the thermal cutout trips.

" ' . . .

" 'The element 76 is a stop for limiting excessive movement of the button 76 inwardly. The thermal cutout is set so as to trip when the heating element H attains a temperature somewhat above the boiling point of the water so that after the water has boiled away . and the heating element becomes excessively heated, it will be de-energized by the thermal cutout tripping, but the thermal cutout will not trip as long as water remains in the receptacle 12 and thereby keeps the temperature of the heating element sufficiently low.'

"Wilder A. Chapman, manager of the laboratories of the Robert W. Hunt Company, testing engineers, and a man of wide experience in testing materials and devices of all sorts, testified for plaintiff. He stated that he was familiar with vaporizers that are used to give off vapors or fumes used in the household for the purpose of treating colds or bronchitis or asthma or diseases of the throat and lungs; that he was familiar with the type of vaporizer known as Knapp-Monarch Kwikway; that a thermal cutout is a device which, by expansion, will break an electrical circuit, that the purpose is to prevent overheating of an electrically operated device; that such a device has been known to the trade for a considerable number of years before 1936; that such a device is practical in installation; that thermal electric cutouts have been used for a good many years in a variety of appliances; that 'I have used them for many years in preventing overheating

of laboratory ovens which are left unattended for a considerable period of time. They are used in electric flatirons. They are used in refrigerators. And very commonly used in electrical devices to prevent overheating. From my own observation, they do prevent overheating, and they do function properly. There are a number of types of cutouts. One very common type consists of two strips of dissimilar metals which, by expansion, are made to separate, and thereby break the circuit. . . . It is a simple attachment, a simple device, this cutout. . . . The only time that it operates is when the water is all out of the vaporizer.'"

Upon the instant appeal no point is made as to the pleadings.

The following is plaintiff's theory: "Plaintiff showed that his mother purchased a vaporizer from the defendant Walgreen Co., with a warranty that it was safe and would not need attention for two hours. This vaporizer was manufactured by the defendant Knapp-Monarch Co., and the literature accompanying it stated that it was safe, and that there was no danger from flame, although in its application for patent this defendant admitted that there was danger from excessive heat if the vaporizer were permitted to run dry. The vaporizer was set up in plaintiff's home by his mother, and the manufacturer's directions as to use were followed literally. No other source of fire except the vaporizer was in the room. Within a period of 30 to 45 minutes, much less than the two hours warranted by the salesperson, a fire broke out, the vaporizer melted and ran down over the chair it was standing on, and the fire spread to the furniture and the bed in which the plaintiff, an infant, was lying."

Defendant Walgreen Company, a corporation, states its theory as follows: ". . . that there was no breach of any implied warranty of the vaporizer; that it did not make any express warranty but if the evidence is held sufficient to show that it did make an ex-

press warranty the evidence shows the warranty was true; that there is no substantial evidence to show that the fire was caused by the vaporizer but if the fire was caused by the vaporizer it was the result of negligence on the part of plaintiff's mother and not due to any fault of the defendant.''

Defendant Knapp-Monarch Company, a corporation, states its theory as follows:

''1. The evidence introduced at the second trial failed to show that due care required vaporizers to be automatic but it did show that if Mrs. Lindroth's testimony was correct, the vaporizer could not have caused the fire, and if on the other hand the vaporizer is assumed to have caused the fire, it could have done so only through an intervening cause not forseeable by the manufacturer.

''2. The vaporizer melted not before the fire, but after and as a direct result of the fire because the evidence at the second trial proved that the heating element of the vaporizer could not melt the aluminum, whereas a fire like the one that broke out in the room could have. Furthermore, plaintiff failed completely to prove that the aluminum was inferior or defective as alleged.

''3. The evidence offered at the second trial on the heating element not only failed to show it was defective but affirmatively showed it to be safe and proper by the temperatures it produced under various circumstances, the length of time it took to evaporate 1–¼ pints of water and the test in court of the heating element in question. Plaintiff offered no evidence that those figures were unusual or abnormal.

''4. There was no evidence that Mrs. Lindroth, the purchaser, relied on any statements of the manufacturer as an inducement to purchasing the vaporizer, and therefore there can be no possibility of warranty. Furthermore, the manufacturer not being a party to the contract of sale could not be held to an express

warranty. No other ground of liability on the basis of these statements was suggested. More important, the statements are true. The vaporizer used 'no flame' to heat the water but an electrical heating element enclosed in a ceramic coating. The only flame that could be connected with the vaporizer would be if it operated for some time without water and its metal surface reached a temperature higher than the igniting point of some readily combustible material which had been placed against it. But this would be no different from any other electrical heating device.

"5. No warning was needed because there was no fire hazard while the vaporizer was being used for its intended purpose of evaporating water. And even when operated improperly, i. e., after the water had boiled out, it created no unreasonable fire hazard."

■ We adhere to the conclusion we reached upon the first appeal, that plaintiff's evidence made out a *prima facie* case against both defendants, and, therefore, it will not be necessary for us to pass upon certain contentions raised by defendants that are based upon the assumption that plaintiff did not make out a *prima facie* case against defendants.

■ We will first consider the contentions raised by defendant Walgreen Company: It contends that "the evidence fails to show that the defendant Walgreen Company was guilty of any negligence or breach of warranty." The determination of this contention turns upon questions of fact, as to all of which the jury found adversely to defendant Walgreen Company's position. The said defendant argues that "the evidence conclusively demonstrates that the vaporizer could not boil dry within an hour and a half; that it could not cause a fire until after it boiled dry and inflammable material came in close contact with it." In our opinion upon the first appeal we stated that "Walgreen Company admits that the overheating of the vaporizer caused the fire, but it insists that that result

'was caused entirely by the exhaustion of water in the vaporizer.'" (329 Ill. App. 119, 120.) Upon the present appeal defendant Walgreen Company states: "The most that can be said is that the vaporizer may have caused the fire *after it boiled dry* if it was in close contact with the pot holder or other cloth material. But, assuming that the vaporizer caused the fire, the evidence heretofore reviewed shows that it could not have caused the fire until after the water in the vaporizer had boiled dry and that the time required for the water to boil dry was *at least* an hour and thirty-seven minutes." The defendants introduced experts who testified that the water in the vaporizer could not boil dry in less than an hour and thirty-seven minutes. Their testimony was based upon experiments made with other vaporizers. Defendants admit that plaintiff's evidence tends to prove that the vaporizer boiled dry within thirty or forty-five minutes, but they contend that that evidence has no probative force in view of the testimony of their experts. It would seem hardly necessary to state that plaintiff's evidence has probative force despite the testimony of the experts. Furthermore, the jury believed the testimony of plaintiff. We feel impelled to state that the jury would have been naive, indeed, if they believed some of the testimony of the experts. The jury undoubtedly took into consideration the partiality shown by the experts in the result of the suit.

■ Defendant Walgreen Company contends that "if Mrs. Lindroth's estimate as to the time of the occurrence of the fire is correct, then the vaporizer could not have caused the fire." This contention is based upon the argument that if Mrs. Lindroth's estimate that the fire occurred within a half hour to forty-five minutes after she set up the vaporizer be accepted as true, then it follows that the fire was not caused by the vaporizer, *because the testimony of the experts shows that the vaporizer could not cause the fire until it boiled*

*dry, and that it could not boil dry in less than an hour and thirty-seven minutes.* Our answer to the prior contention sufficiently answers this one. Defendant Walgreen Company theorizes that the only reasonable inference is that the fire was caused by a short circuit in the cord which Mrs. Lindroth used to connect the vaporizer to the electric current, but concedes that ''whether that is the true explanation of the fire we do not know. But assuming the fire occurred within forty-five minutes after the vaporizer was set in operation, it is the only legitimate inference that can be drawn from the evidence at the present trial. Any other is sheer speculation.'' In our opinion upon the first appeal (329 Ill. App. 112) we refer to certain authorities that hold that where uncertainty arises as to the inferences that may legitimately be drawn from the evidence so that fair-minded men may honestly draw different conclusions, the question is not one of law, but one of fact to be settled by the jury. In a late case, *Roadruck v. Schultz,* 333 Ill. App. 476 *(appeal denied by the Supreme court,* 399 Ill. 628), there were no eyewitnesses to the accident in question, but we held that the plaintiff had the right to prove his case by direct or circumstantial evidence. The principal argument urged by the appellant (one of the defendants) in support of the appeal was that '' 'where equally reasonable inferences may be drawn from the known facts, one leading to the conclusion of liability and the other to nonliability, the plaintiff has failed to make a case for a jury,' . . . that 'inconsistent conclusions were equally capable of being inferred from the undisputed evidence' in this case; that 'neither of these inferences finds any greater support in the record than the other,' and, therefore, plaintiff failed to make out a *prima facie* case.'' (p. 481) We stated that we did not agree with this contention, and in support of our position we quoted (pp. 481, 482) from an opinion by

Mr. Justice McSurely in *Turner v. Cummings*, 319 Ill. App. 225, 228, 229:

" 'In the petition for rehearing filed by the receivers of the streetcar company, it is also said "It is fundamental that an inference cannot be drawn from a fact or state of facts when an inconsistent inference may as readily be drawn from the same facts or state of facts." There are some decisions of this court and probably others where this has been stated, but it is not the law. As we said in *Plodzien v. Segool*, 314 Ill. App. 40, the law is that where "uncertainty arises as to the inferences that may legitimately be drawn from the evidence so that fair-minded men may honestly draw different conclusions, the question is not one of law but one of fact to be settled by the jury. *Denny v. Goldblatt*, 298 Ill. App. 325; *Chicago & N. W. Ry. Co. v. Hansen*, 166 Ill. 623; *Moore v. Rosenmond*, 238 N. Y. 356; *Kavale v. Morton Salt Co.*, 242 Ill. App. 205; *Norris v. Illinois Central R. Co.*, 88 Ill. App. 614; *Richmond & Danville R. Co. v. Powers*, 149 U. S. 43; *Gunning v. Cooley*, 281 U. S. 90; *Best v. District of Columbia*, 291 U. S. 411." See also *Reilly v. Peterson Furniture Co.*, 314 Ill. App. 46. Note the language of Judge Pound in the *Moore* case and of Chief Justice Hughes in the *Best* case.' "

Our opinion proceeds: "See, also, *Lawrence v. Industrial Com.*, 391 Ill. 80, where the Supreme court in passing upon the province of the Industrial Commission stated (pp. 84, 85):

" 'The rule is well settled that it is the province of the Industrial Commission to draw reasonable inferences and conclusions from evidentiary facts, and the courts are not privileged to set aside the findings of the commission unless they are manifestly against the weight of the evidence . . . and it is the exclusive duty and province of the commission to weigh the evidence and draw any and all reasonable inferences

therefrom, and its conclusion in such case is final and not subject to review . . . . If the undisputed facts permit an inference either way, that is, if one reasonable mind may draw one inference and another reasonable mind a different inference from such facts, then the commission alone is empowered to draw the inference and its decision as to the weight of the evidence will not be disturbed on review.' It will be noted that the Industrial Commission, like a jury, is the trier of facts. (See, also, *Reilly v. Peterson Furniture Co.*, 314 Ill. App. 46, 47.)''

While we are satisfied that the action of our Supreme court in denying an appeal in *Roadruck v. Schultz, supra,* is decisive of the question before us, we note that *Tennant v. Peoria & P. U. Ry. Co.*, 321 U. S. 29, 35, and *Lavender v. Kurn,* 327 U. S. 645, 653, follow the same rule.

██ Defendant Walgreen Company contends that ''the evidence upon the present trial fails to show that defendant's clerk made any positive assertion of fact inducing Mrs. Lindroth to purchase the vaporizer and fails to show that Mrs. Lindroth actually relied thereon, and thus fails to establish any express warranty.'' In our opinion upon the first appeal we held that the testimony for plaintiff was sufficient to establish an express warranty. The defendant now contends that the cross-examination of · Mrs. Lindroth upon the present trial weakened the testimony that she gave upon the first trial. We have considered this point and find it without merit. The defendant further contends that ''the court erred in refusing to receive in evidence the statement of Walgreen's clerk, Defendant's Ex. 1 and 1A, under the theory of past recollection recorded.'' After a careful consideration of this contention in the light of the facts and circumstances surrounding the statement which Miss Biegelmeier, Walgreen's clerk, signed on May 23, 1940, we find the contention to be without merit. It would be a danger-

ous and far-reaching rule that would allow the introduction of that statement, as it would permit parties to build up evidence upon an unsound foundation. Defendant Walgreen Company did not seek to refresh Miss Biegelmeier's memory by a reference to the statement, but offered *the statement* in evidence. Miss Biegelmeier stated upon direct examination that the statement did not refresh her recollection of a sale of a vaporizer on May 8, 1940; that she did not know Mrs. Lindroth and did not remember selling her a vaporizer on that date. The court held that while there might be other objections urged to the introduction of the statement, the important objection, in his judgment, was that in the statement there was no identity of the person that the statement recites bought a vaporizer of the witness.

Defendant Walgreen Company next contends that the court erred in submitting to the jury special Interrogatory No. 1, tendered by plaintiff. We will consider this contention when we pass upon the contentions raised by defendant Knapp-Monarch Company.

■ Defendant Walgreen Company contends that "the court erred in receiving in evidence as against Walgreen Company the letters patent, plaintiff's exhibit 15," and argues that it "is not bound by any statement of the inventor, Fisher, in the letters patent with reference to the automatic cutoff therein referred to. Walgreen Company had nothing whatever to do with the design or construction of the vaporizer, nor is there any evidence that Walgreen Company had any knowledge of the letters patent or anything contained therein." We will assume for the purpose of this appeal that the foregoing argument has merit. When plaintiff offered in evidence the letters patent heretofore referred to, the attorney for defendant Walgreen Company objected to its admissibility against that defendant and stated his reasons for the objection. The attorney for defendant Knapp-Monarch Company also

objected to the admission of the document. The court then held that the document was certainly binding upon defendant Knapp-Monarch Company; that ''there is no question about the fact but what it is absolutely admissible against the Knapp-Monarch . . . . I think it is entitled to go in the record,'' but the court further stated: ''I will take counsel's [attorney for defendant Walgreen Company] objection under advisement and I will let it in and be received *against the Knapp-Monarch Company.''* Later counsel for defendant Walgreen Company renewed his objection to the admission of the letters patent against that defendant and again the court stated that he would take the objection under advisement. Still later the trial court again held that the letters patent as to defendant Knapp-Monarch Company was admissible in evidence against that Company, and the court allowed the document to be read to the jury, but he stated that he would reserve his ruling as to the objection of defendant Walgreen Company. The record shows that the court never passed upon the objection of defendant Walgreen Company and there is nothing in the record to show that thereafter the attorney for that Company requested the court to pass upon its objection. The record shows that at the close of the evidence there was a lengthy colloquy between counsel for plaintiff and defendants and the court as to what exhibits had been offered and received in evidence and the proper markings of the same. For some reason the attorney for defendant Walgreen Company during this colloquy did not request the court to pass upon his objection to the letters patent document, nor did he make the slightest reference to that matter. The court called out all of the exhibits by number and when he called out No. 15, the exhibit in question, counsel for plaintiff said *''letters patent is 15''* and still counsel for defendant Walgreen Company made no reference to the fact that the court had his objection under advisement. The follow-

ing then occurred: "The Court: Let us see if we got those right here: Defendants' Exhibit in evidence are 2, 3, 4, 5, 12 and 13 and Plaintiffs' Exhibit 1, 1b, 1c, 1d, 2, 3, and also 1f and 8, 9, 10, 11, 12, 13, 14, 15 and 16. Mr. Close [counsel for defendant Walgreen Company]: 12 and 13 were not admitted. The Court: Of the defendants? Mr. Close: Yes." The court then stated, "They are admitted." It must be noted that at the time of the colloquy the exhibit in question, 15, had already been admitted against defendant Knapp-Monarch Company and read to the jury. The record fails to show that the trial court admitted Exhibit 15 against defendant Walgreen Company. We are unable to see how that defendant can justly raise the instant contention in view of this state of the record. That defendant not only failed to insist that the court should directly pass upon its objection, but it also failed to ask the court to instruct the jury that the exhibit in question had not been admitted against defendant Walgreen Company. Furthermore, counsel for plaintiff, in his opening argument to the jury, stated: "Now you remember the opening statements of the lawyers, don't you? I told you as briefly as I possibly could that Mrs. Lindroth, the mother of this boy, went into a Walgreen drugstore on the 8th of May 1940 and she asked the saleslady if they had a vaporizer in stock and that her children were suffering with colds or bronchial infections of some kind and explained fully to her what she wanted the vaporizer for and Miss Biegelmeier, the saleslady was clothed of course with implied authority of her employer to make any reasonable representation as to the fitness of the articles, which was sought to be purchased, and she told Mrs. Lindroth that she had a very satisfactory vaporizer and Mrs. Lindroth of course never heard of the Kwikway vaporizer, so she informed the saleslady she had one previously, which had been broken and that it had an automatic cut-off; that she had one which operated by electricity and that

when it became too hot or when the temperature rose to such a degree that it became dangerous, there was an automatic device, which cut off the electricity and the electricity did not go on again until the appliance cooled sufficiently so that it could again automatically get the current through and again heat the water and keep the vaporizer going. *Now that is really our whole case against the Walgreen Company;* the lady definitely advised Mrs. Lindroth that the vaporizer was safe, absolutely safe for two hours and that it would not boil dry in less than two hours. Mrs. Lindroth relied upon these representations and was induced to make the purchase because of that; she felt assured as any one of us would under the circumstances; that she might, if she followed the directions implicitly, contained in the carton that enclosed the vaporizer, that it would be perfectly safe, at least for a reasonable length of time.'' By this argument of plaintiff's counsel the jury was told, in effect, that plaintiff was not relying upon the letters patent document as evidence against defendant Walgreen Company.

Defendant Walgreen Company next contends that ''counsel for plaintiff made prejudicial arguments to the jury.'' Counsel for plaintiff made a closing argument to the jury which takes up twenty-seven pages of the record. Counsel for both defendants, who are able and experienced lawyers, especially in the trial of personal injury cases, *sat silent during that entire argument.* At the close of the argument, and when the court was about to instruct the jury, the following occurred at the bar of the court: ''Mr. Close [counsel for defendant Walgreen Company]: *Let the record show* an objection to these arguments as to large corporations and what the higher Court does; it was an appeal to sympathy and is improper. Mr. Querrey [attorney for defendant Knapp-Monarch Company]: I join, Judge. The Court: Your objection is made and shows long after the argument is made. Mr. Close: We can-

not be jumping up and interrupting all the time in the presence of the jury. Mr. Ryan [attorney for plaintiff] : I object, if counsel had any objection to make, I would think it was his duty to make it before I finished. Mr. Close: It was counsel's duty not to make that remark.'' It will be noted that all that counsel for defendants desired in reference to their somewhat perfunctory objection to the argument was to have the record show ''an objection to these arguments as to large corporations and what the higher Court does.'' The court was not asked to rule upon anything nor was the court requested to instruct the jury to disregard any remarks. Now, the defendants, in a search for error, contend that the argument of the attorney for plaintiff was so prejudicial that if the defendants had objected to statements in the argument at the time they were made nothing that the court might say in ruling upon the objections could remove the prejudicial effects of the argument upon the jury. If the alert attorneys for the defendants felt that way during the argument, they ·would have, undoubtedly, exercised their right to move for a withdrawal of a juror. The only reasonable inference that can be drawn from their conduct is that they were willing at the time to gamble upon the verdict of the jury. The law bearing upon the instant contention has been long established. In *Chicago City Ry. Co. v. Gemmill*, 209 Ill. 638, the court states (p. 642) : ''While it is the duty of the trial court, without waiting for an objection from opposing counsel, to control counsel in argument before the jury, still, if counsel desire to take advantage in a court of review of improper remarks of opposing counsel made to the jury in argument, they must first give the trial court an opportunity to remove the evil effect of the remarks, if any, from the minds of the jurors by proper instructions, by making specific objection to the objectionable remarks ·at the time they are made, and if no such specific objection be made and exception preserved at the

time, the objection will not be considered in this court. *Illinois Central Railroad Co. v. Cole,* 165 Ill. 334.'' The foregoing rule, followed in numerous cases, is the settled law of this State. Even in criminal cases that rule has been consistently followed. In *People v. Switalski,* 394 Ill. 530, the court states (pp. 541, 542): ''The first language complained of is the statement made by the prosecutor that he did not have to waste too much time 'because the object of the defense will be to confuse the jury.' No objection was made at the time to this remark, and no attempt made to seek a ruling from the court as to its propriety. Having failed to object when the remark was made, plaintiff in error cannot urge such an objection now. (*People v. Allen,* 368 Ill. 368; *People v. Ruben,* 366 Ill. 29; *Earll v. People,* 99 Ill. 123.) The other language considered objectionable by plaintiff in error was the statement by the prosecutor that he 'just decided to practice without taking any examination, setting himself up in business and has been doing the same for a number of years.' This statement was objected to. The court promptly. sustained the objection and instructed the jury to disregard the statement. This action of the court was sufficient to cure the error, if any. (*Kulvie v. Bunsen Coal Co.,* 253 Ill. 386.) We find no reversible errors in the record.'' We will, however, consider briefly the language used in the objection: ''*Let the record show* an objection to these arguments as to large corporations and what the higher Court does; it was an appeal to sympathy and is improper.'' That defendant Walgreen Company is a large corporation is a matter of common knowledge in this community; that fact is announced over the radio practically every hour of the day by that defendant. The record shows that it owns approximately two hundred stores in the Chicago area. The record also shows that defendant Knapp-Monarch Company is a large corporation. The objection to that part of the argument as to ''what the higher Court

does," would have had some merit if it had been aptly made, and the careful and fair trial judge would have undoubtedly instructed the jury to disregard the statement. We are satisfied from the conduct of the defendants' attorneys that when they made the objection in question they did not desire the trial court to pass upon it and that the sole purpose of the objection was to take advantage of it, if possible, upon review.

The contention of defendant Walgreen Company that "the verdict is grossly excessive," will be considered at the close of this opinion.

■ The first contention of defendant Knapp-Monarch Company is "that reasonable care did not require an automatic cutoff is shown by the exhaustive tests conducted by the manufacturer and the universal use and acceptance of non-automatic electrical appliances." This contention involves a question of fact, which was determined by the jury adversely to this defendant. While it is true that the testimony of the defendant's expert tends to support a contention that reasonable care did not require the automatic cut-off mentioned in the patent application, the jury had before it the admission of defendant Knapp-Monarch Company in the application for letters patent and also the testimony of Wilder A. Chapman, heretofore set forth, and that of David Penn Moreton to the same effect.

■ ■ This defendant contends that "if Mrs. Lindroth's testimony is believed, the vaporizer could not have caused the fire, and in any event the cord, not supplied by defendants, was a far more probable cause." As to the first part of this contention the argument is that the testimony of the experts shows that it was a scientific impossibility for the vaporizer to cause the fire during the time Mrs. Lindroth claimed it was in operation. However, the jury believed Mrs. Lindroth's testimony and did not believe the experts' testimony. As to the last part of the contention, that

the cord was a far more probable cause of the fire, the defendant argues that it is the law that where inconsistent facts may be inferred with equal certainty from the evidence neither inference is reasonable. We have already passed upon this contention. The jury by their verdict found that the vaporizer, not the cord, was the cause of the fire, and we approve of that finding. In our judgment, any intelligent, honest jury would find from the facts and circumstances in evidence that the vaporizer caused the fire. This defendant also contends that "if the vaporizer is assumed to have caused the fire it could have done so only through contact with a readily combustible material after being allowed to operate unattended for over an hour and a half and to boil dry. The presence of such material and the inattention to the vaporizer constitute an intervening and efficient cause not chargeable to defendant." This contention involves questions of fact that were determined adversely to this defendant by the jury. This defendant next contends that "the partially melted condition of the vaporizer after the fire is not evidence that the vaporizer contained inferior materials or poor workmanship. Furthermore, the only reasonable inference from all the evidence is that the melting was the effect rather than the cause of the fire"; that "the heat that melted the aluminum came not from the heating element of the vaporizer but from the fire in the room." Whether the molten aluminum in the vaporizer was the cause or the effect of the fire, was a question submitted to the jury for their determination.

This defendant next contends that "the statements on the vaporizer carton and pamphlet were not express warranties by the manufacturer to the retail purchaser, and, in any event, there is no evidence that the vaporizer did not conform to those statements." The evidence shows that the outside of the carton in which the vaporizer was packed contained the words: "'Quick, safe, no-flame, electrical"; that the circular

containing directions was packed with the vaporizer and Mrs. Lindroth read it before she used the vaporizer. In the circular appears, *inter alia,* the following: "No danger from flame." Plaintiff concedes that as Mrs. Lindroth did not purchase the vaporizer from the manufacturer the latter did not expressly warrant the vaporizer to Mrs. Lindroth individually. Nevertheless, it cannot be doubted that defendant Knapp-Monarch Company owed a duty to plaintiff if the vaporizer was, in fact, an inherently dangerous article. In *Miller v. Sears, Roebuck & Co. of Illinois,* 250 Ill. App. 340, the court said (p. 344):

"Both parties rely in this court upon the decision in *Davidson v. Montgomery Ward & Co.,* 171 Ill. App. 355, where it was held that a vendor is not liable to third parties who have no contractual relation to him. This case held properly that there were three exceptions to this general rule of liability: (1) Where the act of negligence of the person sought to be held liable is with reference to some article imminently dangerous; (2) where the act of negligence consists in the manufacture or sale of an article defective in construction; and (3) where the act of negligence of the person sought to be held consists of a fraudulent or deceitful statement or representation."

In *Wintersteen v. Nat. Cooperage Co.,* 361 Ill. 95, the court said (p. 103):

"The contention is made by the defendant that it owed no duty of due care to the plaintiff, inasmuch as there was no contract between the plaintiff and the defendant. It is axiomatic that every person owes a duty to all persons to exercise ordinary care to guard against any injury which may naturally flow as a reasonably probable and foreseeable consequence of his act, and the law is presumed to furnish a remedy for the redress of every wrong. This duty to exercise ordinary care to avoid injury to another does not depend upon contract, privity of interest or the proximity of

relationship between the parties. It extends to remote and unknown persons. *Colbert v. Holland Furnace Co.,* 333 Ill. 78; *Baird v. Shipman,* 132 id. 16.''

This defendant states that Mrs. Lindroth, the purchaser, did not rely upon any statements of the manufacturer as an inducement to her purchase. Mrs. Lindroth testified that at the time of the purchase she ''had it in my mind that when I got home I would read the directions and follow them implicitly and in using the vaporizer it was my understanding that I had to rely upon the written directions in the box.'' She further testified that when she arrived home and before she used the vaporizer she read the directions in the carton and followed the directions. That the jury believed the representations to be false is shown by the verdict.

Defendant Knapp-Monarch Company contends that ''the special interrogatory as to the vaporizer being an inherently dangerous instrument, assumed unproved facts, was not based on evidence, and an answer would not control a general verdict. It was improper and highly prejudicial.'' The interrogatory and answer are as follows: ''Was the vaporizer in question, when used in accordance with the printed directions accompanying it in the manner and for the purpose intended, an inherently dangerous instrument? Answer: Yes.'' The major argument in support of the instant contention is that an answer to the interrogatory would not control a general verdict; that even if the jury answered, ''No,'' to the interrogatory plaintiff might still get a verdict in his favor. This contention is an afterthought and runs contrary to the position taken by this defendant at the time the instructions were given to the jury. At the request of defendant Knapp-Monarch Company the trial court gave to the jury the following *mandatory instruction:*

''(21) You are instructed that before the plaintiff can recover from the defendant, Knapp-Monarch Com-

pany, he must prove by a greater weight of the evidence *each of the following six propositions:*

"1. *That the defendant, Knapp-Monarch Company, knew, or in the exercise of due care should have known, that a vaporizer of the type and kind involved was such a potentially dangerous instrumentality that if there was any defect therein it was reasonably certain to endanger the life or limb of other persons than the purchaser.thereof when used in the manner and for the use intended.*

"2. That the defendant, Knapp-Monarch Company, failed to exercise that degree of care and caution in the manufacture of the vaporizer in question as would be exercised by an ordinarily prudent manufacturer under the same or similar circumstances.

"3. That as a proximate result of said lack of due care and caution, if you find the defendant, Knapp-Monarch Company failed to exercise due care and caution as aforesaid, there was a defect in the particular vaporizer in question.

"4. That the said vaporizer at the time of the occurrence in question was being used in the manner and for the use contemplated by the manufacturer.

"5. That the user of the vaporizer, in question, was in the exercise of due care and caution at the time of the occurrence in question.

"6. That the defect, if any, in said vaporizer, was the proximate cause of the plaintiff's injuries, if any.

"*If the plaintiff has failed to prove any one or more of the above propositions, then you shall find the defendant, Knapp-Monarch Company, not guilty as to the complaint of such plaintiff.* (Given)" (Italics ours.)

 In view of the position taken by the defendant in the foregoing mandatory instruction, it is idle for it to now contend that if the jury had answered, "No," to the interrogatory that answer would not control the general verdict. The further argument of the

defendant that the interrogatory assumed unproved facts not based on the evidence, is without merit. Mrs. Lindroth testified that when she arrived home and before she used the vaporizer she read the directions in the carton and followed the directions. There is no evidence to dispute that evidence of Mrs. Lindroth. It is not ground for reversal that an instruction assumes as proven a fact conclusively established by the evidence without contradiction. (*Gerke v. Fancher,* 158 Ill. 375; 11 Ency. Pl. & Pr. 132; *I. C. R. R. Co. v. King,* 179 Ill. 91, 96. See, also, *Trust Co. of Chicago v. Ancateau,* 317 Ill. App. 186, 198.) In *Burke v. Molloy,* 294 Ill. App. 442, the court states (p. 448) that "it is not error to assume a conceded or undisputed fact established by the evidence. (*Fisher v. Bennehoff,* 121 Ill. 426; *Town of Normal v. Bright,* 223 Ill. 99; *Illinois Cent. R. Co. v. King,* 179 Ill. 91; *Grannon v. Donk Bros. Coal & Coke Co.,* 259 Ill. 350 [357].)"

 We have given careful consideration to the contention of both defendants that the amount of the verdict is excessive and was based on prejudice and passion. Defendants admit that plaintiff's face is terribly disfigured and that this condition will continue "in the absence of successful plastic surgery." This case was tried by an able, careful and conscientious judge. In passing upon the motion for a new trial he made the following statement in reference to the boy's injuries and the amount of the verdict: "This boy was burned quite badly, very badly, for the rest of his life. He will go through life with a face all marred—a terrible, terrible sight. The whole half of his head—half of his hair and of his head was burned off, half of the hair was burned off; his face, from about the center of his nose back all the way to the center part of his head almost and down his right shoulder was burned so that his face reminded me, aside from the blotches and the raising and depressions of the face from the burns, his face reminded me of the isinglass we used to see on the

old-fashioned stoves, that sort of grayish-brown. The evidence showed in this case that if anything came in contact with that poor little fellow's flesh on that side of the face—this being a very severe third degree burn, his face would crack open and bleed. I am thinking of his side, through life, and how he is going to get along with his playmates and other people through life; if his chance of getting a position is the same chance that anybody else would have. He is in a worse position than a boy with a leg and an arm off. They have mechanical devices for those things. This boy is in terribly bad shape and, although $65,000.00 seems like a lot of money, this boy has his life ahead of him. He is seven years old today. It is a hard case; it is a bad case, that is the only thing, gentlemen. I am not going to touch the size of that verdict, if I do let it stand. That is a bad, bad injury." We have before us two photographs showing the boy's injuries and condition.

Plaintiff, Bruce Lindroth, an infant at the time of the accident, was taken to Evanston Hospital. He developed pneumonia and ran a high fever. His head was "all black and about twice its normal size. His eyes were swollen shut." One of his ears "was just a big, black swollen mass." His condition required the services of two special nurses. For weeks he suffered from anemia as a consequence of the burns. He had to be sprayed with medicine every few minutes day and night for many weeks. During the treatment of his burns his suffering was so intense that he had to be held down by two nurses. The burns became infected and this condition was very stubborn in responding to treatment. He remained at Evanston Hospital for forty-five days, when he was returned to his home, where the treatments were continued. He had a private nurse, and the doctor attended him daily. The treatments at home did not prove successful and on July 6 he was returned to the hospital, where he remained until July 21, when he was transferred to

Ravenswood Hospital. Upon his readmission to Evanston Hospital on July 6 he ran a temperature of 104 degrees. During this last stay in Evanston Hospital he was given supportive treatment in order to keep his general condition as good as possible in order to combat the burns. Because of the high expense at Evanston Hospital plaintiff was transferred, on July 21, to Ravenswood Hospital, where he remained until September 9. When he came out of Ravenswood Hospital his face, scalp and neck were covered with a thin, delicate layer of skin, which was infected and which would break open and suppurate on the slightest cause. At the time of the trial, six and one-half years after the accident, his scalp was "still broken open and a watery discharge was flowing from it." Dr. Benjamin Sargent, the physician and surgeon who attended plaintiff, testified that plaintiff's wounds have never completely healed; that he has a scar ten inches long by eight inches wide, over the cheek, scalp and neck, and one ear is partially destroyed; that his hair follicles and sweat glands are gone; that "there was always some small area in which there was a weeping or breaking down"; that the least irritation, even just hitting himself on the head with his hand, would cause some breaking down of the skin; *that plaintiff's head is retracted to one side by the pulling of the scar tissue.* Dr. Sargent testified that in his opinion skin grafting in the instant case would be "rather heroic" and good results would be difficult to obtain; that the basis for this opinion is that the muscles and underlying tissues were so involved and destroyed, that it is doubtful whether a skin graft could obtain enough local nutrition to grow successfully. The uncontradicted evidence shows that the hospital bills totaled $527.75; that the nurses' bills were $1,441; that Dr. Sargent's bill was $800, and Dr. Graham's bill was $30. *Defendants made no attempt to dispute plaintiff's evidence as to the injuries the boy sustained and the consequences that followed the injuries.*

It is clear that this boy will always be an object of pity and aversion. In our judgment, his injuries will seriously handicap him in every phase of his life. We agree with the statement of the trial court, that plaintiff "is in a worse position than a boy with a leg and an arm off," as "they have mechanical devices for those things." Defendants have cited cases in support of their contention that the damages are grossly excessive, and plaintiff has cited cases in support of his contention that the damages awarded are low. In passing upon the instant contention we have considered the authorities cited, but it would unduly extend this already lengthy opinion to analyze and comment upon these authorities. We have reached the conclusion that the amount of the damages awarded by the jury is not excessive.

The judgment of the Superior court of Cook county is affirmed.

*Judgment affirmed.*

Sullivan, P. J., and Friend, J., concur.