PATRICIA HOLTON et al., Plaintiffs-Appellees, v. MEMORIAL HOSPITAL, Defendant-Appellant.

Fifth District    No. 5—94—0288

Opinion filed September 8, 1995.

Hugh C. Griffin, of Lord, Bissell & Brook, of Chicago, and Edward S. Bott, Jr., of Thompson & Mitchell, of Belleville, for appellant.

Bruce N. Cook, of Cook, Shevlin, Ysursa, Brauer & Bartholomew, Ltd., of Belleville, for appellees.

PRESIDING JUSTICE MAAG delivered the opinion of the court:

Defendant, Memorial Hospital, appeals from a $7,206,500 judgment in favor of plaintiff Patricia Holton on her medical malpractice claim, and from a $110,000 judgment in favor of plaintiff Frank Holton on his loss of consortium claim.

On August 7, 1991, plaintiffs Patricia and Frank Holton filed this action against defendants, Memorial Hospital, Radiological Associates, Ltd., and William G. Doubek, M.D., seeking recovery for personal injuries Patricia Holton allegedly sustained as a result of defendants' negligence and medical malpractice.

On April 19, 1993, plaintiffs entered into a settlement agreement with William Doubek and Radiological Associates, along with three other defendants named in a companion case and insured by the same insurer, for a sum of $2,950,000. On April 27, 1994, pursuant to a finding of good-faith settlement, the trial court dismissed Doubek and Radiological Associates from this action, leaving Memorial Hospital as the sole remaining defendant. The case proceeded to trial.

On December 9, 1993, a jury rendered a verdict in favor of plaintiffs Patricia and Frank Holton and against defendant Memorial Hospital in the sum of $8,706,500 and $110,000, respectively. Defendant filed a post-trial motion alternatively seeking a judgment *n.o.v.*, a new trial on all issues, a new trial on damages only, and remittitur of future medical expenses. Defendant also requested a reduction in the amount of recovery under section 2—1205 of the Civil Practice Law (735 ILCS 5/2—1205 (West 1994)) and a setoff under section 2(c) of the Joint Tortfeasor Contribution Act (740 ILCS 100/1 *et seq.* (West 1994)). The court granted defendant's motion for remittitur and reduced the future medical expenses award by the sum of $1,500,000. The court denied the remainder of defendant's post-trial motion. On April 28, 1994, the trial court entered judgment in favor of plaintiff in the amount of $7,206,500 to reflect the remittitur and stayed execution of the judgment pending the outcome of an appeal. The defendant now appeals. Only portions of this decision are to be published.

## FACTS

Plaintiff, Patricia Holton, began to suffer severe back pain in late November or early December of 1990. X rays and a bone scan revealed that she suffered a compression fracture to the T-3 or T-4 vertebrae in her thoracic spine. Her family physician, Dr. William Doubek, scheduled her for an MRI on January 4, 1991, the earliest nonemergency date available.

On the evening of December 26, 1990, Mrs. Holton presented herself to the Memorial Hospital emergency room in Belleville, Illinois, complaining of a tingling sensation in her left leg and numbness below the waist. The emergency room doctor, Dr. Mark Jergens, examined plaintiff and found she was running a low-grade fever and had an elevated white blood count, indicating an infection. According to Dr. Jergens, she had no loss of motor skills. Dr. Jergens ordered a CAT scan, and plaintiff's doctors admitted her to Memorial Hospital that evening.

Dr. Doubek examined Mrs. Holton early on the morning of

December 27, 1990, and found she had tingling, numbness, and weakness in her lower extremities. Dr. Doubek knew that her condition could be caused by a bone infection known as osteomyelitis or by a tumor in her spine. He ordered a neurological consultation by Dr. Murphy, Sprich, or Schultz and allowed plaintiff to use the bathroom with assistance.

Dr. Murphy, a neurosurgeon, examined plaintiff late in the afternoon on December 27. He noted that plaintiff complained of numbness in her abdomen and legs but could still move all of her extremities. The CAT scan ordered the previous day was also performed late on December 27. It confirmed the compression fracture. The radiologist reading the CAT scan opined, however, that plaintiff's pain was most likely the result of a cancerous tumor.

Plaintiff testified that during the day of December 27, she was having increasing difficulty moving her left leg. She testified that she told her nurses of this. The nurses' progress notes state only that Mrs. Holton did not experience any significant change in her condition during the day.

Sometime after the neurological consult, between 6 p.m. and 7 p.m. on December 27, plaintiff walked to the bathroom by herself. When she was ready to get up from the toilet, she found that she could not move her legs or stand up. She testified that her left leg was particularly numb. A nurse assistant answered her call for help, and along with a second nurse assistant, plaintiff returned to her bed. Neither nurse assistant reported this incident to a supervisor, a nurse, or a doctor.

Sometime between 1 a.m. and 5 a.m. on December 28, 1990, the nurse on duty determined that Mrs. Holton was having difficultly moving her left leg. The nurse testified she did not report this because she did not think it was a significant change in plaintiff's condition.

The nursing shift change occurred between 8 a.m. and 9 a.m. on December 28. After this change in nurses, plaintiff complained of numbness from the waist down and an inability to move her legs. She could move her right foot slightly. Mrs. Holton also lost bowel and bladder control at this time. The nurse called Dr. Doubek and the neurosurgeon on call. Dr. Doubek came immediately and confirmed plaintiff's complete motor loss below the waist.

The doctors ordered a series of tests to determine where the pressure on the spinal cord was located. Dr. Doubek testified that he was working on the misassumption that Mrs. Holton suffered a sudden onset of paralysis because he had not been informed of anything different by the hospital staff. The doctors continued treatment of plaintiff as if she suffered from cancer.

On January 17, 1991, after being paralyzed for three weeks, plaintiff's family transferred her to Barnes Hospital in St. Louis, Missouri, because she was not improving. At Barnes, Mrs. Holton was diagnosed with and treated for osteomyelitis.

On February 5, 1991, Mrs. Holton transferred to St. Elizabeth's Hospital for rehabilitation. She continued on antibiotics as treatment for the osteomyelitis. At St. Elizabeth's, she was noted as suffering from paraplegia with bladder and bowel involvement due to a spinal injury caused by upper thoracic vertebra osteomyelitis.

## DISCUSSION

■ In the third issue raised, defendant contends that plaintiff's counsel, Mr. Cook, deprived Memorial Hospital of a fair trial by his comments and conduct during trial and in closing arguments. Defendant complains of 57 distinct comments which were purportedly prejudicial. We will not address each individual comment complained of by defendant. It is sufficient to say that some of Mr. Cook's comments were appropriate, truthful, and fair given the evidence in the record. Other statements, particularly his comparison of the nurses' conduct in this case to that of the Germans in World War II, were improper. After a careful review of the record, however, we find that with only a single exception defendant's trial counsel, Mr. Sandberg, failed to make *any* timely objection to the alleged errors. The failure to object in a timely fashion must be considered a waiver of defendant's objection. *McElroy v. Force* (1967), 38 Ill. 2d 528, 232 N.E.2d 708; *Ellington v. Bilsel* (1993), 255 Ill. App. 3d 233, 626 N.E.2d 386.

The one instance where Mr. Sandberg made a timely objection concerned Mr. Cook's comment that a witness was just following the "party line." Mr. Sandberg objected and the trial court sustained the objection. The trial court's prompt action in sustaining defendant's objection to plaintiff's comment cured any possible error. (*Cooper v. Chicago Transit Authority* (1987), 153 Ill. App. 3d 511, 505 N.E.2d 1239.) Furthermore, Mr. Sandberg did not ask the court to instruct the jury to disregard Mr. Cook's comment. We can only assume that Mr. Sandberg would have done so if he considered the comment to be as prejudicial as defendant now claims.

We will not try cases on review for the attorneys. Each party has hired counsel to do so. Each counsel has his or her own trial tactics and strategy. It is neither for us nor for the trial court to step in and usurp counsel's strategy. We assume that if counsel chose not to object then he must have had a reason. All litigators should know that failure to object waives the objection. For this reason we will not allow counsel to employ his strategy and then cry foul when the

outcome is not to his liking. *Lindroth v. Walgreen Co.* (1949), 338 Ill. App. 364, 382-83, 87 N.E.2d 307, 315-16, *aff'd* (1950), 407 Ill. 121, 94 N.E.2d 847.

We believe that another incident which occurred deserves special attention. We will describe what took place in chronological order. During cross-examination by Mr. Cook, the following question was asked and the following answer was given by Dr. Jergens:

> "Q. You understand, do you not, sir, that you are a defendant in a companion case to this one? Are you aware of that?
>
> A. I'm not aware of that."

The purpose for the question was to attempt to show bias on the part of the witness.

Dr. Jergens then left the stand. As the doctor was departing the courthouse, an attempt was made to serve the doctor, who resides in Washington State, with a summons and a complaint in the companion case Mr. Cook mentioned. When presented with the summons, Dr. Jergens refused to take it and refused to speak. The doctor then quickly left the courthouse and checked out of his hotel room.

At the same time the attempt at service was being made on Dr. Jergens, the court was conducting a hearing attended by trial counsel out of the jury's presence. Trial counsel were unaware of what was taking place with regard to the attempt to serve Dr. Jergens.

> "THE COURT [addressing Mr. Sandberg]: Okay. It's hard for me to fathom that you did not get permission of the doctor to accept summons even though that was later revoked. He had to know it that there was a collateral—pardon me?
>
> Mr. Sandberg: He had to know it? I have *never talked with Dr. Jergens about that lawsuit* and there is no evidence otherwise—
>
> THE COURT: Let's not point fingers. That irritates me really.
>
> Mr. Sandberg: I'm not pointing a finger at the Court. I apologize.
>
> THE COURT: Okay.
>
> Mr. Sandberg: And I wrote Mr. Cook, I believe, before the lawsuit was ever filed because he told me he was going to be joined in this lawsuit. And I said we would accept service on his behalf and this lawsuit was the only one pending. When Dr. Jergens left town and no longer had a contract with Memorial, I wrote him to say I'm no longer authorized to accept service on his behalf. I believe—better check the records and I went back and looked. My memory is that was before the other lawsuit was filed. And since the time that lawsuit was filed *I have never talked with Dr. Jergens about the lawsuit.*" (Emphasis added.)

After the foregoing comments by the court and counsel, Mr. Cook called the individual who attempted service to testify about the

conversation he had with Ms. Hines in the doctor's presence just minutes before. The individual that attempted service testified:

"She turned to me with a glare telling me that that was a low down dirty whatever to serve the man after a year. I said, 'I thought it was worse for the doctor to perjure himself.' She said, 'He did not perjure himself. The question was whether or not he was a defendant in the lawsuit. And you know as well as I do, Joe, that you're not a defendant in the lawsuit until you're served with the complaint.' "

Upon hearing this testimony, Mr. Sandberg then changed his position before the court:

"Mr. Sandberg: I think he knows that you filed a lawsuit that named him and others. I think he knew that you filed the lawsuit. I don't know that he's ever seen the suit papers.

Mr. Cook: Do you think or do you know, John? You know he knows that, don't you?

Mr. Sandberg: I can say that *up until today* I don't think I've ever covered the subject with him. When I saw that you had a summons and complaint at some point sitting on your table here since—and I wasn't snooping on your table.

Mr. Cook: No, you were getting the doctor ready to run, huh? God, John.

Mr. Sandberg: I told him that yes, I thought you were going to try and serve him. I assumed right in the courtroom.

Mr. Cook: Now, see, Judge, he knows. He knew when the doctor said it that the doctor said something that was not true. He knew it." (Emphasis added.)

Later that same day, the court recalled Dr. Jergens to the stand to testify concerning his testimony and Mr. Sandberg's and Ms. Hines' involvement. Dr. Jergens testified:

"Q. So I mean—so you knew that the suit existed while you were in this courtroom.

A. I knew there was a suit. I was not aware that I was in the suit. As far as I know I'm not in the suit.

Q. Well, have you had occasion—who told you that you were going to be served with summons?

A. The hospital's attorney Kirsten Hines told me that she thought I would be.

Q. All right. Did she tell you summons for what?

A. For a lawsuit.

Q. Where Frank and Patricia Holton had named you a defendant but hadn't served you yet, right?

A. I understood that. I didn't know that that means I've been sued. My understanding was that I had to be served.

Q. Who gave you that understanding?

A. I've gotten that from many sources.

Q. Who gave you that understanding? Did you talk about that with Ms. Hines and Mr. Sandberg?

A. Among others.

Q. Among others. When's the last time that you talked with them about that fact before you testified? Yesterday?

A. We talked about a suit yesterday. But whether or not the last time they talked to me about being summoned?

\* \* \*

Q. All right. Now someone had told you that you're not a defendant in a lawsuit until after you've been served with summons apparently because you've said that.

A. Yes.

Q. All right. And you said numbers of people have told you that including these two right here, Ms. Hines and Mr. Sandberg.

A. Yes, that's my understanding.

\* \* \*

Q. Doctor, when did you first become aware of the fact that the Holton's [sic] had filed a suit in which they were seeking to make you a defendant?

A. I think that's the question you asked me before, isn't it, and I was trying to remember?

Q. That's right. I'm trying to get an answer to it.

A. And I'm trying to remember when I knew that. And I know it was before yesterday as you indicated, but I don't recall when I knew.

Q. How did you find out?

A. My recollection is that I found out from talking to Ms. Hines.

Q. Now, did you talk with them yesterday about the fact that you may be asked about whether or not you're a defendant in a lawsuit.

A. Not to my recollection.

Q. Doctor, again, you were told yesterday that you're not a defendant until you're served with summons by one or both of these lawyers, is that right?

A. That's my recollection.

Q. That's yesterday. Where were you when you had that discussion with one or both of those lawyers.

A. I was at Memorial Hospital.

Q. Who else was present?

A. No one.

Q. Just the three of you?

A. Yes.

Q. Doctor, do you recall me asking you this question: 'You understand, do you not, sir, that you are a defendant in a companion case to this one? Are you aware of that?'

A. You asked me that question today I think.

Q. And your answer was, 'I'm not aware of that.'

A. That's right.

Q. And I take it that your answer was based on the fact that you didn't think you were a defendant until you had been served.

A. That's right.

\* \* \*

Q. All right. But these people told you that directly yesterday.

A. That was my understanding, yes."

Mr. Sandberg also examined Dr. Jergens. Under Mr. Sandberg's questioning Dr. Jergens testified:

"Q. Were you aware that another lawsuit had been filed that had your name on it—in it?

A. Yes.

Q. So you knew that at some point you could be served?

A. Yes.

Q. Did I tell you that because you hadn't been served you're not a defendant in the companion case?

A. That was my understanding from our conversation and from conversations I had with other lawyers.

\* \* \*

Q. Other than what we've just summarized now, did we have further conversations about the other lawsuit?

A. We talked about whether I could be named a defendant or I should say we talked about what I understood is whether I could be named a defendant or not based on the length of time.

Q. Well, yeah, I was including that."

Because of defense counsel's conduct, the trial court made the following statement to the jury the next day:

"Yesterday afternoon, out of your presence, we conducted a hearing concerning about [sic] Mark Jergens' testimony. I determined at the hearing that the doctor's testimony concerning his knowledge of a lawsuit pending against him was not true. I further determined that Ms. Hines and Mr. Sandberg knew the statement was false and had done certain things that encouraged the doctor to believe his answer was accurate. You may consider the fact in determining the credibility of Dr. Jergens' testimony."

■ After reviewing plaintiff's closing argument in the case at bar, we find that it was not improper for Mr. Cook to argue that an adverse inference should be drawn from what occurred. The record

reveals that Mr. Sandberg twice told the court that he had "never" spoken with Dr. Jergens about being a defendant in the companion case. Dr. Jergens refuted these statements, testifying that he had indeed spoken with Mr. Sandberg about being a defendant in the companion case on at least two prior occasions. When Mr. Sandberg said he had never spoken with the witness about the issue, he was neither confused nor simply mistaken. It is clear that Mr. Sandberg told an intentional falsehood, which is commonly called a lie. Thus, the record affords a reasonable basis for plaintiff's charges of dishonesty and misconduct on the part of defense counsel. Mr. Cook's comments as such were permissible. (*Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146.) In any event, the trial court admonished the jury that arguments, statements, and remarks of counsel were not evidence and that the jury should disregard any of counsel's remarks which have no basis in the evidence. We assume that the jury followed the court's instruction. *Chavez*, 161 Ill. App. 3d at 670, 515 N.E.2d at 150.

Defendant asserts that the trial court's comments and statements to the jury indicating the court's disbelief of certain hospital witnesses denied Memorial Hospital a fair trial. Defendant complains of two specific statements. We will examine each in turn.

■ Defendant contends that the court's conduct and comment to the jury with respect to Dr. Jergens' veracity and defense counsel's conduct deprived defendant of a fair trial. Defendant argues that the court must maintain an appearance of complete neutrality and objectivity to avoid influencing the jury and is, therefore, precluded from indicating, by conduct or comment, favor or disfavor towards any of the parties or his opinion on the evidence or witnesses. Defendant finds support for its position in three cases. Defendant first cites *Pavilon v. Kaferly* (1990), 204 Ill. App. 3d 235, 561 N.E.2d 1245. *Pavilon* is a case involving a *pro se* party, in which the court *sua sponte* objected to questions asked by the *pro se* litigant. On appeal, the court held that although the trial court may keep a *pro se* litigant from skewing the evidence in his favor with irrelevancies and half-truths, the court's frequency and manner of objections could be interpreted by the jury as favoring the opposing party. Thus *Pavilon*, with its *pro se* litigant and the trial court's numerous and zealous objections, is distinguishable from the instant case.

Similarly, in *People v. Tyner* (1964), 30 Ill. 2d 101, 195 N.E.2d 675, and *Nastasi v. United Mine Workers of America Union Hospital* (1991), 209 Ill. App. 3d 830, 567 N.E.2d 1358, the court improperly interposed itself into the questioning of the witnesses. These cases do not address the matter at issue.

Generally, a trial judge should be afforded a wide latitude in his or her conduct of a trial. (*Simmons v. City of Chicago* (1983), 118 Ill. App. 3d 676, 455 N.E.2d 232.) A judge's conduct and remarks in the presence of the jury will not warrant a reversal unless they are such as would ordinarily create prejudice in the minds of the jurors. *Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 466 N.E.2d 658.

In a hearing outside the presence of the jury, the court determined that Dr. Jergens had been induced to testify in an inaccurate fashion. Furthermore, the court determined that Mr. Sandberg and Ms. Hines were the persons that improperly coached the witness into making his misstatement of fact. These matters were grudgingly admitted to by the doctor and Mr. Sandberg. We disagree with defendant's claim that it was irrelevant whether Dr. Jergens was aware that he was a defendant in a companion case. The evidence goes to the witness' veracity and credibility. *Trower v. Jones* (1988), 121 Ill. 2d 211, 520 N.E.2d 297.

Finally, and most importantly in our opinion, the record reveals that Mr. Sandberg twice lied to the court when he stated that he had never discussed with the doctor whether or not the doctor was a defendant in a companion case. In fact, Dr. Jergens revealed that not only had they discussed the fact that day, they had also discussed it the day before he testified and on at least one earlier occasion. We pointedly remind Mr. Sandberg and Ms. Hines, who did not speak up to tell the truth despite her presence on all occasions, that a half-truth is equivalent to an outright lie. (*Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282, 433 N.E.2d 253, 257.) We recognize the gravity of our statement that Mr. Sandberg lied to the court. We do not make this statement in a casual manner.

Our supreme court recently held that a circuit court possesses "the inherent authority to dismiss a cause of action with prejudice for failure to comply with court orders where the record shows deliberate and continuing disregard for the court's authority." (*Sander v. Dow Chemical Co.* (1995), 166 Ill. 2d 48, 67, 651 N.E.2d 1071.) The converse of dismissal is the striking of pleadings and the entry of judgment against a defendant. We believe that based upon *Sander* the circuit court had the authority to strike the defendant's answer and order the case submitted to the jury on the issue of damages only, as plaintiff requested as a sanction for this conduct. (*Cf. Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460.) Manipulating the testimony of witnesses and lying by counsel to the courts in this State cannot and will not be tolerated. *In re Marriage of Granger* (1990), 197 Ill. App. 3d 363, 554 N.E.2d 586.

The court did not impose this drastic penalty. Nevertheless,

plaintiff was entitled to have the jury informed, in some fashion, that Memorial Hospital improperly coached its witness to speak a half-truth and, in doing so, that the defendant's attorneys knew of and encouraged the false testimony. Any attempt by a party to conceal or suppress evidence is admissible. (*Kearney v. Brakegate, Ltd.* (1994), 263 Ill. App. 3d 355, 360, 636 N.E.2d 117, 121.) A jury is entitled to consider the destruction, suppression, or fabrication of evidence as an admission. M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.3, at 644 (6th ed. 1994).

In the context of discovery, this court recently stated:

> "Unfortunately, motions alleging a wrongful failure to comply with discovery rules have become common in our trial courts. Some attorneys and their clients rely upon hypertechnical interpretations of discovery requests to withhold information. More frequently, a half-hearted effort is made to determine accurate answers to the question posed. Clients frequently are not made aware of the obligation to give *full* and *complete* answers." (Emphasis in original.) *Boettcher v. Fournie Farms, Inc.* (1993), 243 Ill. App. 3d 940, 948, 612 N.E.2d 969, 975.

To this list we must also unfortunately add that clients and witnesses are sometimes induced to testify in ways that are less than candid, and attorneys, charitably speaking, are sometimes less than candid with the court. It appears that the bigger the case, the greater the urge to win at all costs. We say again, "A 'catch me if you can' attitude is not only unacceptable, but intolerable." *Boettcher*, 243 Ill. App. 3d at 948, 612 N.E.2d at 975.

Under the circumstances, we find that the trial court's statement to the jury, about which defendant complains, was proper under Illinois law and entirely justified.

For the foregoing reasons, the judgment of the trial court is affirmed, with the exception that the judgment amount is hereby reduced by $2,950,000 to reflect the settlements under the Joint Tortfeasor Contribution Act.

Affirmed as modified.

HOPKINS and CHAPMAN, JJ., concur.