ROBERT BOETTCHER, Plaintiff-Appellee, v. FOURNIE FARMS, INC., Defendant-Appellant and Counterplaintiff (Bi-State Cold Storage, Inc., Defendant and Counterdefendant).

Fifth District   No. 5—92—0136

Opinion filed April 26, 1993.

LeFevre, Zeman, Oldfield & Schwarm Law Group, Ltd., of Vandalia (Larry L. LeFevre, of counsel), for appellant.

Ted E. Barylske, of Alton, for appellee.

JUSTICE MAAG delivered the opinion of the court:

The plaintiff, Robert Boettcher, brought suit against the defendants, Fournie Farms, Inc., and Bi-State Cold Storage, Inc., in November of 1986. Boettcher claimed that he sold his entire horseradish crop to Fournie and, pursuant to Fournie's instructions, delivered the crop to Bi-State for temporary storage. While the crop was in storage at Bi-State, the horseradish was damaged. When Fournie and Bi-State failed to pay for the damaged horseradish, Boettcher filed this action.

At trial, Boettcher sought $22,835 in damages from the defendants. The jury returned a verdict against both defendants in the amount requested, and judgment was entered on the verdict. The post-trial motions were denied. Only Fournie appeals from the judgment.

On appeal, Fournie raises the following issues:

1. Did the trial court err in refusing the admission of statements made by Boettcher to the insurance carrier for Bi-State wherein Boettcher claimed to be the owner of the horseradish at the time it was damaged?

2. Did the trial court err in refusing to grant a new trial based upon false answers to discovery by Boettcher, the false nature of which was not discovered until after the trial?

We answer both questions in the affirmative and reverse and remand for a new trial.

The record reveals that Boettcher and Fournie are growers of horseradish. The parties began doing business together sometime between 1980 and 1982. Boettcher testified at trial that he would sell his crop to Fournie, place the roots in the bags provided by Fournie, and deliver the bagged roots to codefendant, Bi-State Cold Storage. The bagged roots would be put in Fournie's account at Bi-State.

Boettcher testified that in October of 1986, he contacted Robert Fournie of Fournie Farms and told him that his crop was ready to harvest. Boettcher claims that Fournie told him to take the crop to Bi-State after harvest. The horseradish was then delivered to Bi-State and put in Fournie's account.

In January of 1987, Boettcher asked Robert Fournie about the money due for the horseradish, and Fournie stated that he had not been paid by the grinders. Boettcher claims he first learned of a problem with the 1986 horseradish crop in March of 1988.

Robert Fournie testified at trial that he is a broker of horseradish, and that he never agreed at any time to purchase Boettcher's entire crop. Fournie admitted that pursuant to the standard practice and custom, he provided strings and bags to package the horseradish. According to Fournie, Boettcher would be paid after the crop was sold to others and the money was collected. He explained that Boettcher's horseradish had been placed in the name of Fournie Farms while in the cold storage to facilitate removal of the crop when it needed to be shipped to a buyer. Fournie stated that he learned the horseradish had been frozen and, therefore, was ruined and unsaleable in December of 1986.

One of the main issues in this case was the question of whether Boettcher or Fournie owned the horseradish at the time it was damaged. During the course of discovery, Fournie tendered the following interrogatory to Boettcher:

"9. Who on behalf of Bi-State Storage, Inc. admitted to you that its equipment malfunctioned, that the corporation had no

insurance, and that the corporation had not paid Fournie Farms, Inc.?''

Plaintiff under oath answered the interrogatory on June 14, 1991. A portion of the answer stated:

"Plaintiffs contacted Bi-State's insurance company, American Empire Surplus Lines, regarding the incident and were sent the attached letter in return ***.''

The letter attached to the answers to interrogatories was dated February 15, 1988, and was sent from Bi-State's insurer addressed to Boettcher as claimant. The letter informed Boettcher that his claim for the horseradish ruined while stored at Bi-State was denied because the claim was excluded under the terms of the coverage.

Thereafter, Fournie served additional interrogatories on Boettcher, including:

"2. If you have made any claim against any insurance company for the loss which is the subject matter of your Amended Complaint, state the following:

A. The name of the insurance company;

B. Each policy number;

C. The effective date of each policy;

D. The name and address of insurance adjuster or claims agent;

E. If the claim was denied, state the basis for the denial of the claim;

F. Identify and give the location of any documents, including witness statements, objects and tangible things submitted to the insurance company.''

This interrogatory was answered under oath on October 30, 1991, stating: "No claims made.''

Fournie asked for production of the following documents:

"1. Any and all insurance policies for which Robert Boettcher has made a claim for his damages as set forth in the Amended Complaint ***.

2. All correspondence or other writings to or from any such insurance company.

3. Any other documents, including witness statements, objects and tangible things which may have been submitted to or received by such insurance company or companies.''

The notice of compliance filed by Boettcher on November 4, 1991, responded to each of these requests with "n/a.''

Fournie attempted to present evidence during the trial concerning ownership of the ruined horseradish by offering evidence of the claim

Boettcher made with Bi-State's insurance carrier. When this evidence was objected to, Fournie made an offer of proof outside the presence of the jury.

It was revealed, during the offer of proof, that Boettcher had contacted Bi-State's insurer regarding the horseradish stored in Bi-State's facility. Boettcher, as a claimant, received a letter dated February 15, 1988, from Bi-State's insurer denying the claim. It was also shown during the offer of proof that Boettcher had denied making any insurance claims for the horseradish in his answers to interrogatories filed November 4, 1991. Fournie's counsel stated that he had a witness from Bi-State's insurer who would testify that the carrier had been contacted by Boettcher for the loss of the ruined horseradish and that when Boettcher made his claim he stated that he owned the horseradish. The trial court denied the offer of proof ruling that there would be no reference to insurance.

During the trial, Fournie's attorney observed Boettcher reading a letter from Country Companies Insurance Company. As a result of that observation, subsequent to the trial, Country Companies was contacted and it was learned that Boettcher had made a claim for the ruined horseradish under his farm owner's insurance policy. At the hearing on Fournie's post-trial motion, a representative of Country Companies testified that Boettcher had a farm owner's policy effective March 13, 1986, through March 13, 1987. The policy covered farm personal property. On February 22, 1988, Boettcher called in a claim stating that he had suffered the loss of his horseradish at Bi-State because "ammonia leaked into storage room and spoiled all the horseradish."

In his statement to Country Companies, Boettcher acknowledged that he placed the horseradish in Robert Fournie's name at Bi-State "on consignment." Boettcher also stated that he had learned of the loss about a year ago. The statement was dated March of 1988.

■ The first issue concerns the admissibility of the evidence regarding Boettcher's claim filed with Bi-State's insurance carrier. Fournie asserted at trial that this evidence was proper and should be admitted to impeach Boettcher on the issue of when Boettcher learned that the horseradish was damaged and to show that Boettcher stated to the insurance adjuster that it was his horseradish.

Boettcher responded that evidence of insurance is inadmissible, and that even if it is admissible for a limited purpose, the prejudicial effect outweighed the probative value. He also claims in this court that the communication with the insurer is privileged.

The trial court ruled that no evidence of insurance would be allowed. Further, evidence of the claim of ownership was barred as irrelevant. The trial court did allow the adjuster, without mention of the circumstances and without mentioning his employer, to testify that in January or February 1988 Boettcher had told him the horseradish was damaged.

While not admissible to show fault, the existence of insurance may be shown in connection with issues such as agency, ownership, control, bias, or prejudice of a witness. *Conover v. Smith* (1974), 20 Ill. App. 3d 258, 314 N.E.2d 638; *Pagano v. Leisner* (1955), 5 Ill. App. 2d 223, 125 N.E.2d 301.

The central issue in the case before us concerned the ownership of the ruined horseradish. At trial, the testimony of the parties was conflicting. Boettcher claimed that he had sold his crop to Fournie prior to storage, and Fournie asserted that the crop belonged to Boettcher. Fournie claimed to be a mere broker. The admissions to the Bi-State insurance adjuster were probative on the issue of ownership. It was the jury's function to determine the weight these admissions deserved.

Further, we fail to see how the mention of the claim made with Bi-State's carrier could have prejudiced anyone. The claim was denied, and none of the parties received an insurance payment.

Too often, courts and counsel raise fears of prejudice if the word "insurance" is even mentioned. In fact, the existence of an insured status or the information contained in insurance applications and claims is often highly probative of issues in a case. With proper limiting instructions and if offered for a purpose other than to show fault, evidence of this type may be admissible.

With reference to the issue of privilege, Boettcher relies on the case of *Chavez v. Watts* (1987), 161 Ill. App. 3d 664, 515 N.E.2d 146, which held that communications between an insured and his insurer fall within the attorney-client privilege. The court in *Chavez* relied upon a line of cases which followed the holding of our supreme court in *People v. Ryan* (1964), 30 Ill. 2d 456, 197 N.E.2d 15.

Clearly, confidential communications made by a client to his attorney are privileged, as are communications made to representatives of the attorney such as paralegals, secretaries, file clerks, or investigators employed by the attorney. (*People v. Knippenberg* (1977), 66 Ill. 2d 276, 362 N.E.2d 681.) Our supreme court in *People v. Ryan* (1964), 30 Ill. 2d 456, 197 N.E.2d 15, held that communications between an insured and insurer, where the insurer is under a duty to defend, are

privileged. The rationale behind this privilege was explained as follows:

> "[B]y the terms of the common liability insurance contract, the insured effectively delegates to the insurer the selection of an attorney and the conduct of the defense of any civil litigation. The insured is ordinarily not represented by counsel of his own choosing either at the time of making the communication or during the course of litigation. Under such circumstances we believe that the insured may properly assume that the communication is made to the insurer as an agent for the dominant purpose of transmitting it to an attorney for the protection of the interests of the insured." *Ryan*, 30 Ill. 2d at 460-61, 197 N.E.2d at 17.

Boettcher's claim of privilege is without merit. In the case before us, Boettcher filed a claim. The insurer had no duty to defend. The insurer was not acting as an agent or representative of an attorney hired by the insurer to protect the interests of Boettcher. The evidence was not privileged.

The second contention of error alleges that the trial court erred in refusing to grant a new trial premised upon Boettcher's failure to comply with the rules of discovery. Boettcher argues that any failure to comply with the rules of discovery was not intentional and was caused by confusion or misunderstanding. It is Boettcher's contention that, notwithstanding his false answers to discovery, Fournie had knowledge of the claims made to the two insurers and, therefore, the trial court did not err in refusing to grant a new trial premised upon the violation of the rules of discovery. He also asserts that the claim he made with his own carrier is privileged and constitutes hearsay. We disagree.

Counsel for Boettcher asserted at oral argument that Fournie had knowledge prior to trial of the claims made against Bi-State's insurer and his own insurer, Country Companies. The record supports this assertion with respect to the claim against Bi-State's insurer. There is no record support for the claim that Fournie knew of the claim Boettcher made with Country Companies, his own insurer. Thus, we will not consider this second contention. See Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)).

In the case before us, there is no doubt that Boettcher failed or refused to reveal in discovery that he had made a claim with his own insurance carrier. He gave false answers to an interrogatory under oath and secreted evidence damaging to his case. The rules of discovery were clearly violated. We cannot condemn too severely this con-

duct in the discovery procedure, nor can we condone the arguments advanced by Boettcher concerning the same.

A reading of the interrogatory directed to Boettcher belies his explanation of confusion or misunderstanding. There is nothing confusing or technical about "[I]f you have made any claim against any insurance company for the loss which is the subject matter of your Amended Complaint, state *** [t]he name of the insurance company ***." Further, it is untenable for Boettcher to contend that Fournie's alleged knowledge of the insurance claims filed, in some fashion, excuses or renders harmless the violation of the rules of discovery. The information withheld was material and probative to the central issue of the case, the ownership of the horseradish.

Discovery is not a tactical game to be used to obstruct or harass the opposing litigant. (*Williams v. A.E. Staley Manufacturing Co.* (1981), 83 Ill. 2d 559, 564-66, 416 N.E.2d 252, 256.) Our discovery rules require full and complete disclosure in order to achieve the ultimate goal of a speedy, efficient, and just resolution of cases. (Supreme Court Rule 219(c) (134 Ill. 2d R. 219(c)).) The discovery rules are designed to further this goal by improving the process used to obtain the essential ingredient of justice—truth. *Campen v. Executive House Hotel, Inc.* (1982), 105 Ill. App. 3d 576, 588, 434 N.E.2d 511, 519.

In *Buehler v. Whalen* (1977), 70 Ill. 2d 51, 374 N.E.2d 460, our supreme court instructed us that half-truths are equivalent to outright lies and "fractional disclosure" is not the disclosure contemplated by our discovery rules. (70 Ill. 2d at 67-68, 374 N.E.2d at 467-68.) "[H]alf-truths *** have the effect of affirmative concealment, since they imply that there is no information or evidence to be sought." *Ostendorf v. International Harvester Co.* (1982), 89 Ill. 2d 273, 282, 433 N.E.2d 253, 257.

"[O]ur discovery procedures are meaningless unless a violation entails a penalty proportionate to the gravity of the violation. Discovery for all parties will not be effective unless trial courts do not countenance violations, and unhesitantly impose sanctions proportionate to the circumstances." (*Buehler*, 70 Ill. 2d at 67, 374 N.E.2d at 467.) Unless there are appropriate sanctions for the refusal or failure to comply with discovery rules, many litigants will fail to fully and accurately comply. *Campen*, 105 Ill. App. 3d at 588, 434 N.E.2d at 519.

In *Buehler*, the court found that the sanction of contempt for the refusal or failure to comply with the rules of discovery was not an appropriate sanction as the court feared that an opposing litigant would be forced to trial without truth. This is the exact situation which occurred in the instant case. We note that at a minimum it is proper to

grant Fournie a new trial, and even that relief, with the time and money involved, is sorely inadequate.

Whether omissions in discovery are intentional or inadvertent, this court will neither condone nor tolerate false, incomplete, or inaccurate discovery. Parties should be aware that all of the remedies under Supreme Court Rule 219 are available to both trial courts and this court pursuant to Supreme Court Rule 366(a)(5) (134 Ill. 2d R. 366(a)(5)). Trial courts should not be hesitant, and we will not be hesitant, to provide remedies under Supreme Court Rule 219, if requested.

Unfortunately, motions alleging a wrongful failure to comply with discovery rules have become common in our trial courts. Some attorneys and their clients rely upon hypertechnical interpretations of discovery requests to withhold information. More frequently, a half-hearted effort is made to determine accurate answers to the question posed. Clients frequently are not made aware of the obligation to give *full* and *complete* answers. "Full Disclosure Required" as stated in Supreme Court Rule 201(b)(1) means just that. 134 Ill. 2d R. 201(b)(1).

It is the obligation of counsel to impress on their clients, and to remain mindful themselves, that while the compliance contemplated by our discovery rules may require the disclosure of facts damaging to the answering party's case, nothing less than full compliance is satisfactory. A "catch me if you can" attitude is not only unacceptable, but intolerable.

With respect to the claim of privilege, our earlier discussion is fully applicable to the claim Boettcher made with his own carrier. It is not privileged.

■■ Finally, Boettcher claims the statements he allegedly made as reflected in the Country Companies file constituted hearsay and are not within the business-records exception to the hearsay rule. We disagree. Supreme Court Rule 236 provides:

> "Any writing or record, whether in the form of any entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record ***. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility ***." (134 Ill. 2d R. 236(a).)

A proper foundation was made at the hearing on the post-trial motion, and the Country Companies records were properly admitted. (*Amos v. Norfolk & Western Ry. Co.* (1989), 191 Ill. App. 3d 637, 548 N.E.2d 96.) In any event, because the existence of the claim was wrongfully concealed, we believe that a full opportunity to discover the facts surrounding the claim was denied to Fournie. Prior to the retrial of this case, Fournie should have the opportunity to fully discover this matter.

Defendant's request for a new trial is allowed. Accordingly, the judgment of the circuit court is reversed, and the cause is remanded for a new trial.

Reversed and remanded.

CHAPMAN, P.J., and LEWIS, J., concur.