SERAFINO PANTALEO, Special Adm'r of the Estate of Joseph Pantaleo, Deceased, Plaintiff-Appellee and Cross-Appellant, v. OUR LADY OF THE RESURRECTION MEDICAL CENTER, f/k/a John F. Kennedy Medical Center, *et al.*, Defendants-Appellants and Cross-Appellees.

First District (2nd Division) No. 1—97—0922

Opinion filed June 2, 1998.

Kevin T. Martin and Kevin V. Boyle, both of Swanson, Martin & Bell, of Chicago, for appellants.

Joseph R. Curcio and Allen I. Tish, both of Joseph R. Curcio, Ltd., of Chicago, for appellee.

JUSTICE TULLY delivered the opinion of the court:

Plaintiff, Serafino Pantaleo, as special administrator of the estate of Joseph Pantaleo, deceased, brought a medical malpractice action to recover damages against defendants, Our Lady of the Resurrection

Medical Center (OLRMC) and Dr. Alison Smith pursuant to the Survival Act (755 ILCS 5/27—6 (West 1994)) and the Wrongful Death Act (740 ILCS 180/0.01 (West 1994)). The jury returned a verdict for plaintiff on the survival count in the amount of $1 million for pain and suffering and $250,000 for disability. The jury also rendered a verdict for plaintiff on the wrongful death count, but awarded zero damages to Serafino and Antoinette Pantaleo, decedent's parents, based on its finding of contributory negligence. In order to reach a result that was consistent with the jury's finding of contributory negligence of both parents, the trial court vacated the judgment for plaintiff on the wrongful death count and entered judgment for defendants. On August 1, 1996, the trial court entered judgment on both verdicts. The trial court denied plaintiff's posttrial motion on February 7, 1997. Defendants now appeal from the verdict on the survival count. Plaintiff cross-appeals from the verdict on the wrongful death count. This court has jurisdiction pursuant to Supreme Court Rule 301 (155 Ill. 2d R. 301).

For the reasons that follow, we affirm.

## FACTUAL BACKGROUND

The following facts were adduced at trial. On November 18, 1988, at approximately 3 a.m., Serafino Pantaleo (Serafino) brought his 17-year-old son, Joseph Pantaleo (Joseph), to OLRMC's emergency room because Joseph was complaining of pains in his right shoulder and under his right armpit. Serafino was also concerned because he had noticed a red mark under Joseph's right armpit.

After they arrived at OLRMC, nurse Terri Aquino examined Joseph. At trial, Aquino recounted that Joseph's vital signs were normal and he did not have a fever. Joseph's only complaint was of pain underneath his right arm. Aquino explained that she proceeded to conduct a physical assessment of Joseph, including an inspection of his right extremity from his fingertips up to his shoulder. During her examination, she did not see anything that would have indicated an "infectious disease process." Specifically, Aquino did not notice a reddened or infected cut on Joseph's right hand.

Next, Dr. Alison Smith, a board-certified emergency room physician, examined Joseph. At trial, Dr. Smith recalled that Joseph told her he was having pains in his right armpit, right shoulder, and right upper arm. When Dr. Smith conducted a physical examination of Joseph, she noted that he did not have a fever and his vital signs were normal. In particular, Dr. Smith did not notice a wound on Joseph's right hand that was reddened, tender, or swollen, or which would have suggested an infection. As a result, Dr. Smith ruled out infection and

did not do a "work-up" of tests for infection. Instead, Dr. Smith diagnosed Joseph's condition as a shoulder strain, prescribed pain and anti-inflammatory medications for shoulder strain, and discharged him. Finally, she instructed Joseph and his father to return to the emergency room if Joseph experienced any increased pain, numbness or weakness.

Joseph's mother, Antoinette Pantaleo (Antoinette), recounted the days that followed Joseph's release from OLRMC. Antoinette explained that she was working on November 18, 1988, when Serafino brought Joseph to the emergency room. When she returned from work, Serafino told her that everything was fine and that Joseph would feel better in a few days. Joseph complained of a fever, chills, and pain in his right arm. However, he did not vomit or have diarrhea. Antoinette testified that she did not realize that Joseph was seriously ill until he was admitted to Gottlieb Hospital on November 21, 1988.

Serafino also testified about the events that ensued over the weekend. On Saturday, Serafino noticed a redness on Joseph's chest. Joseph complained of increasing pain in his right arm. However, Joseph did not vomit, have diarrhea, chills or a fever. On Sunday, Serafino observed that the redness on Joseph's chest had extended to his face. Early Monday morning, Serafino noticed a red line going up Joseph's right arm and Joseph crying in pain. At this point, Serafino became very concerned and drove Joseph to the emergency room at Gottlieb Hospital.

After they arrived at Gottlieb Hospital on Monday, November 21, 1988, Dr. Fred Fishman, a board-certified emergency room physician, examined Joseph at approximately 6 a.m. At trial, Dr. Fishman testified that Joseph had a red streak, known as lymphangitis, emanating from his right thumb to his forearm. Joseph gave him a history of an infection on his right thumb of approximately five to six days. Dr. Fishman's examination of Joseph's thumb revealed it was reddened, swollen, and warm with crusty areas surrounding the infection and these observations were consistent with the history Joseph had given him. Dr. Fishman also drew a connection between the painful axilla, or armpit, and the ascending lymphangitis originating in the thumb. He reasoned that the tender nodes under the armpit meant that the body was trying to fight off a distal infection. After his examination, Dr. Fishman requested that Dr. Donna Hanlon, an infectious disease specialist, examine Joseph.

Dr. Hanlon began her examination at approximately 9 a.m. and initially diagnosed Joseph with streptococcal toxic shock syndrome emanating from the wound on his right thumb. At trial, Dr. Hanlon explained that streptococcal toxic shock syndrome was a rare disease

entity in 1988 and that there was only one published medical article on it. After her examination, Dr. Hanlon obtained a history from Joseph. In a medical record, Dr. Hanlon wrote that Joseph stated that his right thumb was painful and red on November 16, 1988, and that he had cut his right thumb about one week prior to that date. She concluded that Joseph was an accurate historian and reasoned that "if it (the thumb) was painful and red on the 16th and again on the 21st when I saw him, it probably was also on the 18th." Dr. Hanlon also realized that the five- to six-day history of infection in Joseph's right thumb was not only consistent with her exam, but also with the history obtained by Dr. Fishman. Subsequently, she diagnosed Joseph as having cellulitis (an infection of the skin on his right arm), with lymphangitis (an accompanying inflammation of the lymphatic or lymph channels leading towards the lymph nodes), hypotension (shock), and renal failure (kidney failure).

Around 5 p.m. that same day, Dr. Hanlon saw Joseph again. She observed that he was conscious with a temperature of 99.8 degrees. She also noted that the pain in his armpit was more severe than she would have expected. Dr. Hanlon described Joseph as alert but intermittently confused, which was an indication of the toxic effect of the infection.

On November 22, 1988, at 4 a.m., Dr. Hanlon checked on Joseph and noted that he was alert and conscious with a temperature of 104.2 degrees, but he was confused. The next time Dr. Hanlon saw Joseph was 6 a.m. At this time, Joseph's kidneys had failed and his system was becoming very acidotic from the infection and the shock. Dr. Hanlon ordered the insertion of a catheter into his lung in order to combat the shock. At 8 a.m., Joseph was intubated to assist with his breathing. He was still conscious, although only when stimulated. Dr. Hanlon checked on Joseph again later that day and wrote a note, but did not indicate the time. She noted that Joseph was much sicker, completely dependent on the breathing machine, but still conscious. At trial, Dr. Hanlon could not comment as to whether Joseph was still conscious at 7:30 p.m.

On November 23, 1988, at 5 p.m., Joseph became hypotensive, suffered a cardiac arrest and died. Dr. Hanlon's final diagnosis was streptococcal toxic shock syndrome, secondary to cellulitis lymphangitis of the right upper extremity, and acute renal failure, secondary to sepsis. She defined shock as an inadequate blood supply to the body's tissues and organs and defined toxic shock as a group of symptoms caused by a toxin which is produced by a germ.

Plaintiff called two expert witnesses, Dr. James Todd and Dr. Gary Harris. Dr. Todd, plaintiff's infectious disease expert, opined that

there were signs of infection present on November 18 when Joseph was examined by Dr. Smith. He believed Joseph's thumb was red on November 18, because the Gottlieb chart indicated that Joseph had stated a history of a red, sore thumb beginning around November 16. In addition, the chart showed that Joseph had developed a tender axilla and Joseph's thumb was red on November 21. Dr. Todd also testified that if Joseph had received the appropriate antibiotics on November 18 or November 19, Joseph may have lived.

Plaintiff's emergency medical expert, Dr. Harris, explained that he believed Dr. Smith had deviated from the applicable standard of care in her treatment of Joseph for the following reasons: (1) failure to properly examine and evaluate Joseph upon his initial presentation; (2) failure to take a proper history; (3) failure to do a proper examination based upon knowledge of Joseph's history; (4) failure to diagnose infection that existed in his extremity at the time of his examination; (5) failure to treat the infection; and (6) failure to admit him to the hospital. Dr. Harris also concluded that, to a reasonable degree of medical certainty, Dr. Smith's deviations from the applicable standard of care were the proximate cause of Joseph's death.

Next, defendants called three expert witnesses: Dr. Jacek Franaszek, Dr. Daniel Mass, and Dr. Paul Arnow. Dr. Franaszek, an expert in emergency medicine, testified that he believed that Dr. Smith complied with the standard of care in her treatment of Joseph. He based his opinion upon the normal vital signs, the absence of any medical evidence in the record that there was an infection on November 18, and Dr. Smith's examination. However, he also stated that if Serafino was correct about the red spot under Joseph's armpit on November 18, then the standard of care would have called "for a more vigorous consideration of the possibility of infection." He also opined that if Joseph's thumb was red and swollen when Dr. Smith examined him on November 18, then a failure to "work-up" the possibility of infection would constitute a deviation from the applicable standard of care.

Dr. Mass, an expert in orthopedic medicine, concluded that Dr. Smith's diagnosis of shoulder strain conformed with the proper standard of care. Dr. Arnow, a board-certified specialist in infectious diseases, testified that if there was no evidence to suggest an infection, then the standard of care would not have required hospitalization or treatment with antibiotics. However, he also stated that if there was evidence of infection, like a red thumb, then the standard of care would have required a "work-up" of infection.

During trial, the court issued a limiting instruction to the jury. The court stated that the professional liability insurance paid by the

hospital on behalf of Dr. Smith was to be considered only on the limited issue of whether Dr. Smith was an agent of the hospital or an independent contractor.

Furthermore, during closing arguments, plaintiff's counsel stated "you folks determine whether or not care in the emergency room meets certain standards. You set the standard; we don't set the standard." Following closing arguments, the trial court issued jury instructions, one of which was not a standardized Illinois Pattern Jury Instruction (IPI) on apparent agency. The jury then rendered its verdict. After trial, plaintiff made a posttrial motion requesting the circuit court to vacate the jury's finding of the parents' contributory negligence and to have a new trial solely on the issue of wrongful death damages. The trial court denied that motion and this appeal followed.

## ISSUES PRESENTED FOR REVIEW

On appeal, defendants argue that a judgment notwithstanding the verdict is appropriate because plaintiff failed to establish: (1) a *prima facie* case of medical negligence; (2) that the survival damages were proximately caused by Dr. Smith's negligence; and (3) that Dr. Smith was acting as either the actual or apparent agent of OLRMC. Defendants also urge that: (4) the jury's award of survival damages was excessive; (5) the jury's verdict that Dr. Smith was negligent was against the manifest weight of the evidence; (6) the jury's finding that Dr. Smith was the actual and apparent agent of OLRMC was against the manifest weight of the evidence; (7) the trial court erred in allowing evidence that OLRMC provided Dr. Smith with liability insurance; (8) the trial court erred in allowing Dr. Todd's testimony; (9) plaintiff's counsel made improper prejudicial remarks during closing argument; and (10) plaintiff's non-IPI instruction on apparent agency did not properly state the law.

On cross-appeal, plaintiff submits that: (1) the trial court abused its discretion by allowing defendants to file the affirmative defense of contributory negligence on the eve of trial; and (2) the jury's findings of the parents' contributory negligence and that their contributory negligence was a proximate cause of death were against the manifest weight of the evidence.

## OPINION

■ We first address defendants' motion to dismiss this appeal for lack of subject matter jurisdiction. Defendants argue that the circuit court lacked subject matter jurisdiction because Serafino was appointed special administrator of the estate of Joseph Pantaleo for the purpose of proceeding with the wrongful death action before trial, but

was not appointed administrator of the estate for the purpose of the survival act count until after final judgment was entered, and that this court therefore lacks jurisdiction. See *Wilmere v. Stibolt*, 152 Ill. App. 3d 642, 504 N.E.2d 916 (1987). Defendants' motion is denied. Based on the limited facts of this case, as in *Pavlov v. Konwall*, 113 Ill. App. 3d 576, 447 N.E.2d 982 (1983), it was clear from the beginning that Serafino, Joseph's father, intended to bring the survival action as administrator of Joseph's estate. That Serafino became the administrator of the estate for the purpose of proceeding with the survival action when he did "should not prevent the cause from being decided on its merits in furtherance of justice." *Pavlov*, 113 Ill. App. 3d at 579, 447 N.E.2d at 984; *cf. Selke v. Bove*, 258 Ill. App. 3d 932, 629 N.E.2d 747 (1994) (statute governing amendments to pleadings before final judgment should be construed liberally in order to allow the resolution of cases on the merits, with any doubts resolved in favor of allowing amendments).

■ That said, we first turn to defendants' contention that a judgment notwithstanding the verdict is appropriate because plaintiff did not establish a *prima facie* case of medical negligence. The standard to be employed by this court in assessing the propriety of a denial of a motion for judgment notwithstanding the verdict is well established in Illinois. A judgment notwithstanding the verdict ought to be granted only in those cases where all the evidence, when viewed in its aspect most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967).

■ In order to recover in a case for medical negligence, a plaintiff must prove: (1) the proper standard of care against which the professional's conduct must be measured; (2) a negligent failure to comply with the standard of care; and (3) that the health professional's negligence was one of the proximate causes of the complained of injury. *Saxton v. Toole*, 240 Ill. App. 3d 204, 210, 608 N.E.2d 233, 238 (1992). More specifically with regard to proximate cause, the plaintiff must prove that it is more probably true than not true that a defendant's negligence was a proximate cause of the plaintiff's injury. *Pumala v. Sipos*, 163 Ill. App. 3d 1093, 1098, 517 N.E.2d 295, 298 (1987).

■ Here, with regard to the proper standard of care, plaintiff sufficiently established, through expert testimony, the proper standard of care. Dr. Harris opined that the proper standard of care would have required Dr. Smith to "work-up" the possibility of infection. Specifically, Dr. Harris testified that he believed Dr. Smith deviated from the standard of care in her treatment of Joseph when she: (1) failed to

properly examine and evaluate Joseph upon his initial presentation; (2) failed to take a proper history; (3) failed to do a proper examination based upon knowledge of Joseph's history; (4) failed to diagnose infection which existed in his extremity at the time of his examination; (5) failed to treat the infection; and (6) failed to admit him to the hospital. Accordingly, we note that plaintiff established the proper standard of care.

Defendants also claim that the evidence that Joseph's thumb was red on November 18, 1988, was insufficient to establish a breach of the standard of care. We disagree. It is within the jury's province to determine the credibility of witnesses, weigh evidence, and resolve conflicts. *Bass v. Washington-Kinney Co.*, 119 Ill. App. 3d 713, 728, 457 N.E.2d 85, 97 (1983). It is well settled that the appellate court is not the forum in which to retry the facts of each case. The jury heard the expert testimony regarding the breach of the standard of care and found that Dr. Smith was negligent in failing to notice Joseph's red, swollen thumb when she examined him on November 18, 1988. Thus, after careful review of the record, we fail to perceive how all the evidence so overwhelmingly favors defendants that no contrary verdict could ever stand. Accordingly, we find no error.

■ With regard to defendants' next contention, they claim that a judgment notwithstanding the verdict was appropriate because plaintiff failed to establish that the survival damages were proximately caused by Dr. Smith's breach of the standard of care. Conversely, plaintiff claims that the evidence shows that Dr. Smith failed to diagnose Joseph's infection when it was in its beginning phases. Specifically, defendants claim that there was no evidence that Dr. Smith caused Joseph any more pain than he would have otherwise experienced as a result of the already present toxic process. However, the jury weighed the evidence and found that Dr. Smith's failure to diagnose the infection resulted in a toxic process that caused Joseph considerable pain and suffering and ultimately resulted in his death. Again, our review of the record fails to show how the jury's determination that it was more probably true than not that defendants' negligence that proximately caused Joseph's injury so overwhelmingly favors defendants that no contrary verdict could ever stand. In sum, as evidenced by the record, we find that defendants were medically negligent.

■ Defendants next assert that they were entitled to judgment notwithstanding the verdict because plaintiff did not establish that Dr. Smith was acting as either OLRMC's actual or apparent agent. A hospital may be liable based upon a principal-agent relationship between the hospital and a physician. *Gilbert v. Sycamore Municipal*

*Hospital,* 156 Ill. 2d 511, 518, 622 N.E.2d 788, 792 (1993). In order to determine whether a physician is an agent or independent contractor of a hospital, two dominant factors to be considered are the hospital's right to control the physician's actions and the method of payment to the physician. *Johnson v. Sumner,* 160 Ill. App. 3d 173, 176, 513 N.E.2d 149, 151 (1987); *Greene v. Rogers,* 147 Ill. App. 3d 1009, 1014, 498 N.E.2d 867, 871 (1986). In *Gilbert,* 156 Ill. 2d 511, 622 N.E.2d 788, our supreme court criticized the *Greene* and *Johnson* decisions. *Dahan v. UHS of Bethesda, Inc,* 295 Ill. App. 3d 770, 775-76 (1998). The supreme court observed that these cases overlooked the "realities of modern hospital care." *Gilbert,* 156 Ill. 2d at 520, 622 N.E.2d at 793. The court concluded that, because of the realities of modern hospital care, "liability attaches to the hospital only where the treating physician is the apparent or ostensible agent of the hospital. If the patient knows, or should have known, that the treating physician is an independent contractor, then the hospital will not be liable." *Gilbert,* 156 Ill. 2d at 522, 622 N.E.2d at 794. *Gilbert* set forth the test for apparent authority as follows: a plaintiff must show that a reasonable person would conclude that the individual was an employee or agent of the hospital; that the hospital had knowledge of and acquiesced in the appearance of authority; and that the plaintiff relied with ordinary care on the agent's or hospital's conduct. *Gilbert,* 156 Ill. 2d at 525, 622 N.E.2d at 795. When there is some dispute as to the extent of the parties' relationship, the existence and scope of an agency relationship are questions of fact for the jury to decide. *Barbour v. South Chicago Community Hospital,* 156 Ill. App. 3d 324, 329, 509 N.E.2d 558, 562 (1987).

■ Our review of the evidence presented at trial convinces us that there is no reason to disturb the jury's finding that Dr. Smith was an apparent agent of the hospital. There was more than ample evidence to support the jury's finding of OLRMC's liability. When Joseph was brought to OLRMC's emergency room, Joseph did not ask for Dr. Smith specifically, nor was Dr. Smith Joseph's physician. Dr. Smith was merely the physician who was covering the emergency room that day. Joseph did not know and could not have known that Dr. Smith was an independent contractor, nor did the hospital inform him of that. Accordingly, we find that the evidence, when viewed in a light most favorable to plaintiff, did not overwhelmingly favor defendants such that the verdict in this case cannot stand.

■ We now turn to defendants' contention that they are entitled to a new trial or, in the alternative, a remittitur because the jury's award of survival damages was excessive. A new trial should only be granted if the verdict is contrary to the manifest weight of the evidence.

*Pedrick*, 37 Ill. 2d at 509, 229 N.E.2d at 513. A verdict will be deemed to be against the manifest weight of the evidence if it is palpably erroneous and wholly unwarranted, the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based on the evidence. *Sandy Creek Condominium Ass'n v. Stolt & Egner, Inc.*, 267 Ill. App. 3d 291, 294, 642 N.E.2d 171 (1994), citing *Doyle v. White Metal Rolling & Stamping Corp.*, 249 Ill. App. 3d 370, 618 N.E.2d 909 (1993). Courts have a responsibility to carefully scrutinize the record to determine whether the amount of a verdict is so large as to indicate that it is the result of prejudice or passion, or the amount "shocks the judicial conscience." *Wagner v. City of Chicago*, 254 Ill. App. 3d 842, 860, 626 N.E.2d 1227, 1240 (1993); *Northern Trust Co. v. County of Cook*, 135 Ill. App. 3d 329, 481 N.E.2d 957 (1985); see *Barry v. Owens-Corning Fiberglass Co.*, 282 Ill. App. 3d 199, 668 N.E.2d 8 (1996) (where the court found that $4,400,000 in pain and suffering damages was not excessive in a survival action or against the manifest weight of the evidence).

Plaintiff relies heavily on *Holston v. Sisters of the Third Order of St. Francis*, 165 Ill. 2d 150, 650 N.E.2d 985 (1995), for its suggestion that the jury's survival award was not excessive. In *Holston*, our supreme court ruled that a jury's verdict of $600,000 for the plaintiff's pain and suffering and $400,000 for the plaintiff's disability and disfigurement was not excessive in a survival action, even though the medical malpractice victim died in a coma. The hospital argued that most or all of the patient's pain was expected discomfort following surgery and that, after the patient lost consciousness, she felt no further pain. The supreme court upheld the appellate court and stated that the evidence of increasing pressure on the heart, rising pulse rate, and declining blood pressure created a reasonable inference that the victim suffered more than she would have in a normal post-operative course. Furthermore, the supreme court noted that the evidence of the patient's pain and suffering included the time preceding the emergency surgery, which was performed several hours after the negligent operation.

■ We believe that the facts in this case are more compelling and extreme than those of *Holston*. In both cases the victims were young, in *Holston*, a 29-year-old woman, and here a 17-year-old boy. In *Holston*, the victim had suffered acutely for five hours after a negligent operation before losing consciousness. Here, Joseph was conscious for about 26 hours while painful procedures were being performed on him. Joseph suffered significantly more than he would have if he had been diagnosed properly and the progression of the infection to streptococcal toxic shock syndrome had been prevented. Specifically,

Joseph experienced severe armpit pain, a rising temperature, shock, renal (kidney) failure, confusion, and loss of respiratory function. In addition, the issue of Joseph's pain and suffering was not limited to the period of time in which he was at Gottlieb. The evidence of Joseph's pain and suffering includes the time preceding his admission to Gottlieb when he was in the beginning stages of shock through over a 26-hour period in which a number of painful procedures were performed on Joseph while he was still conscious. In sum, the award for Joseph's suffering was by no stretch of the imagination against the manifest weight of the evidence.

 Defendants' fifth argument is that the jury's verdict of Dr. Smith's negligence was against the manifest weight of the evidence. We note that we have previously set forth the case law for the manifest weight of the evidence standard. In applying this standard, a reviewing court views the evidence in the light most favorable to the appellee. *Hulman v. Evanston Hospital Corp.*, 259 Ill. App. 3d 133, 150, 631 N.E.2d 322, 333 (1994). A reviewing court may not set aside a jury verdict merely because the jury could have determined the credibility of the witnesses differently or drawn different inferences of fact. *Hulman*, 259 Ill. App. 3d at 150, 631 N.E.2d at 333. In the present case, we find that the jury's verdict was not against the manifest weight of the evidence.

Dr. Todd opined that there were signs of infection present on November 18 when Joseph was examined by Dr. Smith. He reasoned that Joseph's thumb was red on November 18 because Joseph had stated a history of a red, sore thumb beginning around November 16, had developed a tender axilla, and his thumb was still red on November 21. Furthermore, Dr. Harris testified that Dr. Smith deviated from the standard of care in her treatment of Joseph and that her deviations were the proximate cause of Joseph's death. Accordingly, we will not upset the verdict "merely because the jury could have drawn different inferences and conclusions from conflicting testimony" presented at trial. *Collins v. Roseland Community Hospital*, 219 Ill. App. 3d 766, 776, 579 N.E.2d 1105, 1111 (1991).

 Defendants' sixth claim is that the jury's finding that Dr. Smith was the actual and apparent agent of OLRMC was against the manifest weight of the evidence. For the same reasons noted previously, we find that the jury's verdict with respect to this issue was not against the manifest weight of the evidence.

●12 With respect to defendants' seventh claim that the trial court erred in allowing evidence that OLRMC provided Dr. Smith with liability insurance, plaintiff maintains that evidence of insurance is admissible to show an agency relationship between Dr. Smith and the

hospital and that the probative value outweighs the prejudicial effect. Although insurance is not admissible to show fault, "the existence of insurance may be shown in connection with issues such as agency, ownership, control, bias, or prejudice of a witness." *Boettcher v. Fournie Farms, Inc.*, 243 Ill. App. 3d 940, 945, 612 N.E.2d 969, 973 (1993).

In the instant case, testimony of liability insurance was properly used to show that an agency relationship existed because OLRMC denied having an agency relationship with Dr. Smith. In addition, any error in the admission of the insurance information was cured by way of a special instruction. See *Hobart v. Shin*, 292 Ill. App. 3d 580, 589, 686 N.E.2d 617, 622 (1997). The trial court stated that the professional liability insurance paid by the hospital on behalf of Dr. Smith was to be considered only on the limited issue of whether Dr. Smith was an agent of the hospital or an independent contractor. Thus, even if there was an error, it was harmless.

■ Still to be considered is defendants' claim that Dr. Todd's opinion testimony violated the disclosure requirements of former Supreme Court Rule 220 (134 Ill. 2d R. 220) and resulted in reversible error. We note that Rule 220 has been repealed by our supreme court, effective on January 1, 1996. Nevertheless, since this case was filed before the effective date, Rule 220 will be applied to the present case. Defendants do not allege a violation of any particular section of Rule 220 but, rather, allege a general violation. Under Rule 220(d), an expert's testimony at trial may not be inconsistent with or go beyond the fair scope of the facts known or opinions disclosed through interrogatories and depositions. 134 Ill. 2d R. 220(d). The decision to allow or exclude expert testimony is a matter committed to the sound discretion of the circuit court and will not be interfered with unless it appears to have been abused. *Huelsmann v. Berkowitz*, 210 Ill. App. 3d 806, 810, 568 N.E.2d 1373, 1376 (1991). The trial court retains discretion in its ruling on the admissibility of an expert's testimony, even if a technical violation of Rule 220 exists. *Holston*, 165 Ill. 2d at 163, 650 N.E.2d at 991.

Upon carefully reviewing the record on appeal, we find that the trial court did not abuse its discretion. Dr. Todd's pretrial opinion was "that failure to institute appropriate antibiotic treatment at [OLRMC] caused or contributed to the patient's ultimate demise at Gottlieb." Dr. Todd then opined at trial that Joseph's thumb was red and the infection was visible on November 18, when he was examined by Dr. Smith. The trial court correctly ruled that even if there were some technical violations, these statements did not violate the substance of Rule 220. Defendants' argument that Dr. Todd's trial opinion was

improperly allowed to exceed the scope of his deposition, to the surprise and prejudice of defendants, is unpersuasive. As the trial court correctly ruled, there was no surprise to defendants because Dr. Todd's deposition testimony indicated that he believed that Joseph's reddened thumb existed on November 18. Accordingly, we reject defendants' argument that Dr. Todd stated a new or unfairly surprising opinion regarding the presence of the red thumb and infection.

■ With regard to defendants' next argument, that plaintiff's remarks during closing argument were improper, plaintiff submits that the statements were taken out of context of plaintiff's entire closing argument. Specifically, defendants cite the following statements as being prejudicial: "You folks determine whether or not care in the emergency room meets certain standards. You set the standard; we don't set the standard." Defendants' argue that plaintiff's counsel suggested to the jury that it did not need expert testimony to support a verdict in favor of plaintiff. Illinois law is clear that an error is not reversible unless it can be shown that the error was substantially prejudicial and, therefore, unduly affected the outcome of the trial. *Schaffner v. Chicago & North Western Transportation Co.*, 161 Ill. App. 3d 742, 515 N.E.2d 298 (1987). Defendants do not cite any supporting case law. In addition, they fail to convince us how these comments prejudiced their case and denied them a fair trial. The trial court sustained defendants' objection to the statement during closing arguments and quickly confirmed that the jury determines the appropriate standard of care from the testimony of the expert. Furthermore, defendants failed to object a second time when the statement was repeated. Thus, we find no reversible error.

■ Finally, defendants contend that plaintiff's non-IPI instruction on apparent agency, which was copied from *Gilbert*, 156 Ill. 2d at 525, 622 N.E.2d at 796, did not properly state the law and therefore denied them a fair trial. The non-IPI instruction states in pertinent part:

"Dr. Smith is an apparent agent of the hospital, such that the hospital would be liable for her negligence, if the plaintiff proves the following two factors:

(a) 'That the hospital holds itself out as a provider of emergency room care without informing the patient that the care is provided by an independent contractor;

(b) The plaintiff relies upon the hospital to provide complete emergency room care, treatment, and services, and does not request treatment from a specific physician.' "

See *Gilbert*, 156 Ill. 2d at 525, 622 N.E.2d at 796. It is well within the trial court's discretion to determine which instructions shall be given,

and the exercise of such discretion will not be disturbed by this court in the absence of an abuse of discretion. *Harding v. Amsted Industries, Inc.*, 276 Ill. App. 3d 483, 658 N.E.2d 1208 (1995). After reviewing the record before us, we find no abuse of discretion. Defendants, who rely on *Northern Trust Co. v. St. Francis Hospital*, 168 Ill. App. 3d 270, 522 N.E.2d 699 (1988), which came before *Gilbert*, fail to persuade us that the jury instructions given inaccurately stated the law. Regardless, as the trial court noted at the hearing on defendant's posttrial motion, the evidence established an agency relationship between OLRMC and Dr. Smith.

■ We now turn to plaintiff's cross-appeal. Plaintiff first claims that the trial court erred by allowing defendants to file their affirmative defense of contributory negligence on the eve of trial. The decision of whether to allow amendments to the pleadings is within the sound discretion of the trial court and should not be disturbed upon review absent an abuse of that discretion. *Hobart*, 292 Ill. App. 3d at 585, 686 N.E.2d at 620; *Carlisle v. Harp*, 200 Ill. App. 3d 908, 915, 558 N.E.2d 318, 322 (1990). Courts generally consider the timeliness of the amendment and whether the opponent was prejudiced or surprised by its filing. *Carlisle*, 200 Ill. App. 3d at 915, 558 N.E.2d at 322. Such amendments should be liberally allowed to further the ends of justice. *Hobart*, 292 Ill. App. 3d at 585, 686 N.E.2d at 620.

In the case at bar, we find that the trial court did not abuse its discretion. Although the record indicates that defendants knew about the facts concerning their affirmative defense for some time and offered no explanation for the late filing, plaintiff clearly was not surprised. When the trial court questioned plaintiff's counsel regarding the affirmative defense, plaintiff's counsel stated, "I suspected that it was coming." The trial court later concluded, "I say you're not surprised." Moreover, plaintiff's counsel questioned defendants' expert witnesses about the parents' contributory negligence during their depositions. Furthermore, the trial court gave plaintiff's counsel another opportunity to take Dr. Smith's deposition, if he had unanswered questions or if he was surprised by the affirmative defense. Thus, we find no abuse of discretion.

■ Still to be considered is plaintiff's contention that the trial court erred in denying its posttrial motion because the jury's finding of the parents' contributory negligence was against the manifest weight of the evidence. Plaintiff further submits that the jury's finding of the parents' contributory negligence was against the manifest weight of the evidence because defendants did not present any expert testimony that the parents' conduct was a proximate cause of Joseph's death. We note that the case law regarding the manifest weight of the

evidence standard has previously been set forth. Contributory negligence is the failure to exercise that care which, under the circumstances presented by the evidence, a reasonably prudent person would take to avoid injury. *Bothun v. Wallace*, 61 Ill. App. 3d 365, 377 N.E.2d 1054 (1978). The issue of contributory negligence is ordinarily a question of fact to be determined by the trier of fact. *Haist v. Wu*, 235 Ill. App. 3d 799, 816, 601 N.E.2d 927, 937 (1992).

After a painstaking review of the record on appeal and the evidence presented at trial, we find that the jury's finding that the parents were contributorily negligent, and that such negligence was the proximate cause of Joseph's death, was not unreasonable. Upon leaving OLRMC on Friday, November 18, Serafino was told to return to the hospital with Joseph if Joseph experienced any increased pain, numbness or weakness. Even though both Serafino and Antoinette testified that Joseph's pain in his upper arm increased over the weekend, Joseph was not taken to the hospital until Monday, November 21. In addition, Serafino said that he noticed a redness on Joseph's chest on Saturday which had extended to his face by Sunday. Furthermore, proximate cause was supported by Dr. Todd's testimony that if Joseph had received antibiotics on November 19, he probably would have survived. We also note that the cases that plaintiff relies on regarding proximate cause are not on point. Accordingly, we find that the jury's finding of contributory negligence was supported by the record and, therefore, was not against the manifest weight of the evidence.

In sum, we find that a judgment notwithstanding the verdict was not appropriate, the trial court did not err by allowing defendants to file the affirmative defense of contributory negligence on the eve of trial and the jury's finding of contributory negligence was not against the manifest weight of the evidence.

In light of the foregoing, we affirm.

Judgment affirmed.

McNULTY, P.J., and COUSINS, J., concur.